UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN DOE and JANE DOE,

    Plaintiffs,

v.

SYRIAN ARAB REPUBLIC,
Damascus, Syria

    and

SYRIAN MILITARY INTELLIGENCE
(al-Mukhabarat al-`Askariya)
Syrian Ministry of Defense
Omayad Square
Damascus, Syria,

    Defendants.

Civil Action No.:_____

**COMPLAINT**

Plaintiffs bring this action pursuant to the provisions of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.* ("FSIA") and the Anti-Terrorism Act, 18 U.S.C. § 2331, *et seq.* ("ATA"). This action arises out of the personal injuries suffered by John Doe in the terrorist suicide bombings in the departure hall of the Brussels International Airport on March 22, 2016. These bombings were carried out by members of the Islamic State of Iraq and the Levant ("ISIL"), a Foreign Terrorist Organization ("FTO") so designated by the United States Secretary of State, operating with material support and resources provided by the Syrian Arab Republic ("Syria"), a designated State Sponsor of Terrorism so designated by the United States Department of State in 1979 and having remained so designated at all times since. The terrorists caused, and John Doe and Jane Doe sustained, several "personal injur[ies]" as required

by 28 U.S.C. § 1605A, thereby entitling the Plaintiffs, as American victims of Syrian terrorism, to bring this action and recover damages pursuant to applicable law.

Plaintiffs state in support of their Complaint and allege the following:

## THE PARTIES

**A.     The Plaintiffs**

1.     This action is brought by Plaintiffs, by and through their counsel, in their individual capacities.

2.     Plaintiff John Doe is a United States citizen and a victim of "personal injury" as required by 28 U.S.C. § 1605A. Plaintiff John Doe can sue and be sued in this Court.

3.     Plaintiff Jane Doe is a United States citizen and the wife of John Doe, and is a victim of "personal injury" resulting from her husband's injuries as required by 28 U.S.C. § 1605A. Plaintiff Jane Doe can sue and be sued in this Court.

**B.     The Defendants**

4.     Defendant Syria is a foreign state that was designated as a State Sponsor of Terrorism pursuant to section 60 of the Export Administration Act of 1979, 50 U.S.C. App. § 2405, section 620(A) of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, and section 40 of the Arms Export Control Act, on December 29, 1979, and has remained so designated, continuously, ever since. Syria has been included on the U.S. State Department's list of State Sponsors of Terrorism longer than any other state.

5.     Abū Bakr al-Baghdadi (a.k.a. Ibrahim Awad Ibrahim al-Badri) is an Iraqi National and Sunni Salafi jihadist. On October 4, 2011, the U.S. State Department added al-Baghdadi to the list of Specially Designated Nationals and, as of December 2017, offers a

$25 million reward for information or intelligence leading to his capture or death—the same reward that was offered for Saddam Hussein and Osama bin Laden.

6. al-Baghdadi is the leader of ISIL, which has been designated as a terrorist organization by the United Nations, the European Union and the United States (which designated ISIL as an FTO on December 17, 2004). As set forth in this Complaint, al-Baghdadi and ISIL perpetrated the terrorist bombings of the Brussels Airport on March 22, 2016.

7. Defendant Syria, at all times pertinent to this action, provided material support and resources to al-Baghdadi, ISIL, and the organizations that preceded and spawned ISIL, including al-Qaeda in Iraq ("AQI") and the Islamic State of Iraq ("ISI"), and participated directly in their activities, enabling them to carry out a murderous campaign of terrorism in Europe, including in Brussels. Syria is and has been a State Sponsor of al-Baghdadi and ISIL, within the meaning of 28 U.S.C. § 1605A and the Flatow Amendment, by providing them with funding, equipment, arms, direction, logistical support, and/or training for their terrorist activities. Since 2004, the United States has placed sanctions on the Syrian Arab Republic and various leaders of the Syrian government in response to their support for terrorism, efforts to undermine stability in Iraq and other countries, human rights violations, and the pursuit of weapons of mass destruction.

8. Defendant Syrian Military Intelligence ("SMI") is the principal Syrian intelligence service through which Syria sponsored al-Baghdadi, AQI and ISIL.

9. President Bashar al-Assad presently rules Syria as a dictator, and has done so continuously since 2000.

10. President Bashar al-Assad performed acts within the scope of his office, employment, and agency which provided material support and sponsorship to al-Baghdadi and

ISIL, and caused personal injuries resulting from the acts of terrorism described herein. Accordingly, as provided in 28 U.S.C. § 1605A(c), Defendant Syria has direct liability for its own acts, and there is vicarious liability for the acts of President Bashar al-Assad.

11. Defendants Syria and SMI are liable to the Plaintiffs for damages resulting from the acts of despicable and heinous acts of terrorism described herein.

## JURISDICTION AND VENUE

12. Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2) and 1605A, and 18 U.S.C. § 2334.

13. Syria and SMI are subject to suit in the courts of the United States as a State Sponsor of Terrorism and for providing material support to al-Baghdadi and ISIL's activities pursuant to the FSIA, ATA and related statutes.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4), which provides, in pertinent part, that a civil action against a foreign state may be brought in the United States District Court for the District of Columbia.

15. 28 U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a State Sponsor of Terrorism, and also against any official, employee or agent of that foreign state while acting within the scope of his or her office, employment or agency, for wrongful death, personal injury and related torts caused by an act of torture or extrajudicial killing or the provision of material support and resources for such acts.

16. 18 U.S.C. 2333(a) provides a federal private right of action to nationals of the United States for injuries to their person, property, or business resulting from an act of international terrorism, against a foreign state which aids and abets, knowingly provides

substantial assistance to, or which conspires with a person who committed an act of international terrorism.

## THE MARCH 22, 2016 SUICIDE BOMBINGS AT THE BRUSSELS INTERNATIONAL AIRPORT

17. In or around May 2014, a number of terrorists cells began to coalesce and operate in and around the city of Brussels, Belgium. On May 24, 2014, Mehdi Nemmouche opened fire at the Jewish Museum of Belgium in Brussels, killing three people and critically injuring a fourth. Upon capture, Nemmouche was found to be in possession of the flag of ISIL. Prosecutors subsequently released a statement that Nemmouche had spent over a year living and fighting with other Islamic extremists in Syria prior to returning to Belgium and planning the attack.

18. On November 13, 2015, individuals associated with a terrorist cell in Belgium carried out an attack in Paris, France, using firearms and explosives, killing over 130 people and wounding hundreds more. According to media reports, several of the terrorists involved in the attack had repeatedly traveled back and forth to Syria for training and recruiting operations, including the bombmaker, Najim Laachraoui.

19. On Tuesday, March 22, 2016, at 7:58 a.m. CET, Laachraoui, along with one of his accomplices, Ibrahim El Bakraoui, detonated two large suitcase bombs, nine seconds apart. Both bombs hit the check-in rows near the entrance of the airport, where passengers were gathered to check baggage. Notably, many of the passengers were gathering to check baggage on a Delta Airlines flight from Brussels to New York.

20. The attacks ripped through the airport and victims, killing 17 and seriously injuring 81 others, including Plaintiff John Doe. The aftermath of the murderous attacks was devastating to Brussels and Belgium as a whole. Streets were closed and the city was placed on

lockdown. Controlled explosions were carried out on other suspicious objects, including a third bomb discovered at the Brussels airport.

21. The bombs prepared by Laachraoui were constructed in an apartment in the Brussels district of Schaerbeek, and were designed to inflict maximum damage on the innocent victims of the attack. Following the attack, police found over thirty pounds of Acetone Peroxide explosive, also known as Triacetone Triperoxide, along with a suitcase full of nails and small metal bolts used to inflict additional damage. The amount of explosives, the use of nails and bolts, and the targeting of a crowded public space were all measures deliberately calculated to inflict as much death, pain and destruction as possible. Police also found the flag of ISIL in the apartment used to make the bombs for the attack.

22. Laachraoui, along with one of the two suicide bombers that attacked the Brussels airport departure hall, received training and support from ISIL while in Syria in or around February 2013. Two French journalists, who were taken hostage by ISIL in 2013 and released in 2014, confirmed that Laachraoui was guarding Western hostages at an ISIL prison during their captivity. In April 2016, following the attack, ISIL confirmed in its propaganda magazine, *Dabiq*, that Laachraoui received training and fought for the terrorist organization while in Syria. In July 2016, ISIL prepared a video celebrating terrorist attacks it had sponsored during Ramadan which featured Laachraoui as one of the perpetrators.

## DEFENDANTS' SPONSORSHIP OF, AND PROVISION OF MATERIAL SUPPORT AND RESOURCES TO, AL-BAGHDADI, THE SUICIDE BOMBERS, AND ISIL

23. Defendants' sponsorship of, and provision of material support and resources to, al-Baghdadi, the suicide bombers and ISIL must be understood in terms of the totalitarian nature of the Syrian regime, and in the context of its long history of employing terrorism as a tool for advancing its domestic and international agendas.

24. The Syrian Arab Republic is a republic in name only. In reality, it is a dictatorship and police state that strategically exhibits only the external forms of a democratic regime. Its constitution vests one particular party – the Arab Socialist Ba'ath Party – with leadership functions in the State and society. It also vests broad powers in the person of the President, making him Secretary General of the Ba'ath Party and leader of the National Popular Front, a coalition of smaller minority political parties that are authorized to exist by the regime in order to create the appearance of a multi-party political system. The President has the power to issue laws, and since 1963 an Emergency Law has been in force that suspends most constitutional protections for Syrians. The President completely controls the legislative process.

25. In 1966, Syrian Ba'athists conducted a coup, during which they eliminated all opposition political parties. Hafez al-Assad was appointed Minister of Defense. In 1970, Hafez al-Assad led another coup during which the Ba'ath party was purged of internal opposition, several of its leaders were jailed, and Hafez al-Assad was installed as President.

26. For the subsequent forty years, the al-Assad family has controlled the Syrian regime without interruption. Hafez al-Assad had a three-decade Presidency, lasting from 1971 to 2000, in which he was confirmed President in unopposed referenda five consecutive times. In 2000, he was succeeded by his son, Bashar al-Assad. Bashar al-Assad was confirmed as President, leader of the Ba'ath Party and leader of the Army, for a seven-year term during an unopposed referendum held in 2001 in which he claimed 97.2% of the vote. He was re-appointed in another unopposed referendum in 2007, this time claiming 97.6% of the vote.

27. Members of President al-Assad's own minority sect, the Alawites, control most key positions in the Syrian military and Syrian intelligence and security services. The Ba'ath Party is heavily influenced by the Syrian military and Syrian intelligence and security services,

the latter consuming a large share of Syria's economic resources. The President and his senior aides in the Syrian military and Syrian intelligence and security services make most important decisions in Syrian political and economic life.

28. On March 20, 2003, a multinational force led by the United States invaded Iraq. The force toppled the regime of Saddam Hussein, and commenced a long-term operation intended to establish the conditions necessary for the creation of a democratic government in Iraq. Syria formally opposed the invasion and occupation. Syria's foreign minister stated publicly that it was in Syria's interest to see the American invasion of Iraq fail.

29. Abu Musab al-Zarqawi, a Jordanian national, was named a Specially Designated Global Terrorist by the U.S. Department of the Treasury on September 24, 2003. Following the United States invasion of Iraq, Syria permitted al-Zarqawi to establish AQI's logistical and operational support network within its borders, commanding AQI forces in Iraq from within Syria. During this time, al-Zarqawi was frequently present in Iraq but Syria remained his haven.

30. On April 6, 2004, al-Zarqawi was convicted and sentenced to death in Jordan for the 2002 killing of Laurence Foley, an American diplomat who was shot to death near his home in Amman. Twenty days later, Jordanian security forces foiled a plot by al-Zarqawi and AQI to conduct a chemical weapons attack. In a televised confession, an AQI terrorist described in detail how he had been part of an AQI terror cell led by al-Zarqawi, plotting to explode chemical bombs at the office of the Jordanian Prime Minister, the headquarters of the Jordanian intelligence services, and the American Embassy in Amman. Support and resources for the attack, including approximately $250,000 for materials, vehicles, and personnel, were provided by Syria through al-Zarqawi's lieutenant, Abu al-Ghaddiyeh, who was operating AQI's support network in Syria.

31.     In 2005, the U.S. Department of State in its Patterns of Global Terrorism concluded Syria was a "facilitation hub for terrorists operating in Iraq . . ."

32.     Over several years, Syria provided material support and resources to al-Zarqawi and AQI in their campaign to use terrorism to destabilize Iraq and to eject American forces from Iraq by, *inter alia*, (1) harboring and providing sanctuary to AQI terrorists and their logistical and supply network; (2) facilitating the recruitment of AQI terrorists, their training, and their transportation into Iraq; (3) facilitating the transfer of weapons through Syria for use by AQI terrorists in Iraq; and (4) facilitating the transfer of funds to al-Zarqawi and AQI in Iraq. According to former Iraqi Defense Minister Saadoun al-Dulaimi, "We know the terrorists have no other gateway into Iraq but Syria." In *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53 (D.D.C. 2008), this court found Syria liable for the 2004 AQI beheadings of two U.S. civilian contractors in Iraq because it had provided material support to AQI beginning in 2003.

33.     Following al-Zarqawi's death in 2006, Syria's continued support of AQI promoted and eventually spawned the Islamic State of Iraq ("ISI"). In 2013, ISI was expanded to include some territory in Syria, officially lengthening the group's title to match its expanded territory to become ISIL. Without Syria's direct and material assistance to al-Zarqawi and AQI in the early 2000s, ISIL would not exist today.

34.     In 2007, United States Senator Joseph Lieberman publicly charged, "Al-Qaida in Iraq is sustained by a transnational network of facilitators and human smugglers, who replenish its supply of suicide bombers – approximately 60 to 80 Islamist extremists, recruited every month from across the Middle East, North Africa and Europe, and sent to meet their al-Qaida handlers in Syria, from where they are taken to Iraq to blow themselves up to kill countless others."

35. The U.S. Department of State, in its 2008 Country Reports on Terrorism, stated, "The United States continued its focused efforts to mitigate the threat posed by foreign fighters in Iraq. State Sponsors of Terrorism, Iran and Syria, continued to play destabilizing roles in the region." It also noted that "nearly 90% of all foreign fighters entering Iraq are transiting from Syria."

36. Syria claims that it is fighting ISIL but it is not. Throughout the Syrian Civil War, Syria has both deliberately refrained from attacking ISIL and provided ISIL with direct military and financial support. Early on, Syria identified ISIL, which was hostile to the United States and Western-backed rebels, as a force that it could use to divide the opposition and put pressure on other rebel groups. In 2011, when Syrian citizens were peacefully protesting against Syria as part of the "Arab Spring," Syria cracked down on secular protestors while releasing hundreds of imprisoned Islamic extremists in order to infiltrate and discredit the opposition. Many of ISIL's current leaders were released in this amnesty, including Amr al-Absi (a.k.a. Abu Atheer), who would go on to recruit foreign fighters for ISIL and become Laachroui's commander in Aleppo. Syria's strategy had its intended effect; Syria, near collapse early on, has strengthened its position while the rebellion has fragmented and lost international support.

37. In June 2015, Syria supported ISIL fighters advancing on the rebel-held city of Aleppo through air strikes which were described by the U.S. State Department as "not only avoiding ISIL lines, but, actively seeking to bolster their position." Throughout the war, Syria and its allies have been widely criticized by international observers for targeting rebel groups fighting ISIL while largely sparing ISIL itself. Syria's assistance to ISIL and its de facto truce with the group enabled ISIL to gain control over wide swaths of Syrian territory, people and

resources. This territory provided ISIL with funding and a base of operations from which ISIL has planned and directed international terrorist attacks.

38. Syria has also cooperated closely with ISIL economically. Since capturing oil and natural gas fields early in the war, ISIL has continuously sold the oil, power and natural gas resources it controls to Syria, and has relied on regular payments from Syria as a primary source of funding. ISIL and Syria closely cooperate on shared energy infrastructure, most notably in the Tuweinan gas facility, which is operated from ISIL territory for the mutual benefit of Syria and ISIL—providing mutually agreed upon shares of electricity to both Syria and ISIL, with protection money paid by Syria to ISIL. The money which Syria has paid ISIL for these resources has been critical to ISIL's efforts to recruit, train, and arm foreign fighters and has helped to finance ISIL's international terrorist activities abroad. Danny Glaser, then the Assistant Secretary for Terrorist Financing at the U.S. Treasury Department, summarized the relationship in 2015: "the Assad regime needs the oil, ISIS needs the cash, and they're willing to do business even as they're fighting each other."

39. Syria has continued to be designated as a State Sponsor of Terrorism and has continued to sponsor designated FTOs in an unrepentant and unapologetic manner, providing material support, logistics, safe haven and assistance to those who maim and kill innocent American citizens and others through acts of terrorism.

40. The provision of material support and resources to AQI and later ISIL, known and designated FTOs, by the Syrian government, acting directly and by and through individual governmental leaders, representatives and instrumentalities as named in this Complaint, constitute violations of applicable and numerous U.S. laws, thereby rendering the Syrian Defendants jointly and severally liable for their illegal acts and deeds.

## COUNT I – BATTERY
### (Under 28 U.S.C. § 1605A(c) and State Common Law)

41. Plaintiff John Doe repeats, realleges and incorporates by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

42. On March 22, 2016, ISIL terrorists led by al-Baghdadi willfully, violently, and forcefully committed terrorist acts during the bombing of the Brussels Airport in Brussels, Belgium, with the express purpose of inflicting severe pain and suffering and death. The willful, wrongful, and intentional acts of al-Baghdadi and ISIL, which were sponsored and materially supported by the Defendants, each constituted a battery upon the person of Plaintiff John Doe, causing injury to him as set forth above.

43. As a direct and proximate result of the willful, wrongful, and intentional acts of al-Baghdadi and the other ISIL terrorists, carried out with material support, resources and sponsorship furnished by Defendants, Plaintiff John Doe was injured in that he endured extreme mental anguish, physical injury and pain and suffering, all to his damage.

**WHEREFORE**, Plaintiff John Doe demands that judgment be entered, jointly and severally, against Defendants for the damages he suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of **TEN MILLION U.S. DOLLARS ($10,000,000)** on this Count I, and his costs expended.

## COUNT II – ASSAULT
### (Under 28 U.S.C. § 1605A(c) and State Common Law)

44. Plaintiff John Doe repeats, realleges and incorporates by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

45. During the terrorist attacks, ISIL terrorists led by al-Baghdadi intentionally and willfully put Plaintiff in fear for his life and apprehension of harm and injury as a direct result of

the terrorists' actions in entering a peaceful, civilian airport terminal with deadly bombs and exploding them in plain sight, all to his damage.

46.  As a direct and proximate result of the willful, wrongful, and intentional acts of al-Baghdadi and the other ISIL terrorists, carried out with material support, resources, and sponsorship furnished by the Defendants, Plaintiff John Doe was injured in that he endured extreme mental anguish, physical injury and pain and suffering, all to his damage.

**WHEREFORE**, Plaintiff John Doe demands that judgment be entered, jointly and severally, against the Defendants for the damages he suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of **TEN MILLION U.S. DOLLARS ($10,000,000)** on this Count II, and his costs expended.

### COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, INCLUDING SOLATIUM
(Under 28 U.S.C. § 1605A(c) and State Common Law)

47.  Plaintiffs Jane Doe and John Doe repeat, reallege and incorporate by reference those facts and allegations set forth in all of the foregoing paragraphs as if fully set forth.

48.  The terrorist murders of eighteen passengers and each and all of the acts set forth above, constitute extreme and outrageous conduct with the intent to inflict emotional distress, including solatium, upon Plaintiffs John Doe, Jane Doe and other members of his family. Further, these acts were undertaken for the purpose of intentionally and without mercy causing mental duress and suffering, including solatium, upon the members of John Doe's family.

49.  As a direct result and proximate result of the willful, wrongful and intentional acts of al-Baghdadi and the other ISIL terrorists, carried out with material support, resources and sponsorship furnished by the Defendants, Plaintiffs, as above set forth, were caused to suffer permanent and severe emotional distress, all to their damage.

WHEREFORE, Plaintiffs demand that judgment be entered, jointly and severally, against Defendants for the damages they suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of **TEN MILLION U.S. DOLLARS ($10,000,000)** each on this Count III, and their costs expended;

### COUNT IV – ACTION FOR AIDING AND ABETTING
(Under 28 U.S.C. § 1605A(c) and State Common Law and State Statutory Law)

50. Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in each of the foregoing paragraphs as if fully set forth.

51. Defendants Syria and SMI did knowingly and willfully provide substantial assistance to and sponsor a terrorist organization within the meaning of 28 U.S.C. § 1605A, which terrorist organization willfully and deliberately committed acts of terrorism, which caused the personal injuries of Plaintiff John Doe, all to his damage.

52. For the reasons stated above, and having aided and abetted a terrorist organization which willfully and deliberately committed an act of terrorism which caused the personal injuries of Plaintiff, Defendants are liable to Plaintiffs for all damages in this civil action.

53. **WHEREFORE**, Plaintiffs demand that judgment be entered, jointly and severally, against Defendants in the amount of **TEN MILLION U.S. DOLLARS ($10,000,000)** each on this Count IV, and their costs expended.

### COUNT V - 28 U.S.C. § 1605A(c)

54. Plaintiffs repeat, re-allege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

55. On March 22, 2016, ISIL terrorists led by al-Baghdadi, and supported and aided by the Defendants, willfully, violently and forcefully committed terrorist acts at the Brussels

Airport in Brussels, Belgium with the express purpose of inflicting, personal injury, severe pain, suffering, death and severe emotional injuries.

56. In addition, the act of assaulting Plaintiff John Doe, and each and all of the acts set forth above, constituted extreme and outrageous conduct with the intent to inflict emotional distress upon them and emotional distress, including solatium, upon members of his family including Plaintiff Jane Doe. Further, these acts were undertaken for the purpose of causing severe mental duress and suffering, including solatium damages, upon the members of the Plaintiffs' family.

57. The willful, wrongful and intentional acts of ISIL terrorists led by al-Baghdadi were sponsored, supported, aided, assisted and directed by the Defendants.

58. As a direct and proximate result of the willful, wrongful and intentional acts of ISIL terrorists led by al-Baghdadi, whose acts were materially supported, sponsored, aided and directed by Defendants, Plaintiff John Doe was assaulted, and he, Plaintiff Jane Doe and their family endured extreme mental anguish, physical injury and pain and suffering, all to their damage.

**WHEREFORE**, Plaintiffs demand that judgment be entered against Defendants for the damages suffered by Plaintiffs, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of **TEN MILLION U.S. DOLLARS ($10,000,000)** for each of them on this Count V, and their costs expended, including attorneys' fees.

### COUNT VI – ACTION FOR CONSPIRACY
(Under 28 U.S.C. § 1605A(c) and State Common Law)

59. Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in each of the foregoing paragraphs as if fully set forth.

60. Defendants Syria and SMI, did knowingly and willfully conspire with

and/or agree to sponsor a terrorist organization within the meaning of 28 U.S.C. § 1605A, which said designated FTO willfully and deliberately committed an act of terrorism, which caused the personal injuries and of Plaintiff, all to their damage.

61.  For the reasons stated above, and having conspired to sponsor and support, aid and assist the terrorist organization that willfully and deliberately committed the acts of terrorism that caused the personal injuries and of Plaintiffs, Defendants are jointly and severally liable to Plaintiffs for all damages in this civil action.

**WHEREFORE**, Plaintiffs demands that judgment be entered, jointly and severally, against Defendants in the amount of **TEN MILLION U.S. DOLLARS ($10,000,000)** for each of them, on this Count VI, and their costs expended.

### COUNT VII – ANTI-TERRORISM ACT
(Under 18 U.S.C. § 2333(a))

62.  Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in each of the foregoing paragraphs as if fully set forth.

63.  The Brussels Airport Bombing constituted an act of international terrorism pursuant to 18 U.S.C. § 2331 that violated federal laws, including but not limited to 18 U.S.C. § 2332 (prohibiting terrorist acts of attempted murder and violence), and at the time that act was committed, planned and authorized, ISIL was designated as an FTO under section 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189.

64.  Defendants Syria and SMI, did knowingly and willfully aid and abet, provide substantial assistance to, and conspire with ISIL, the designated FTO that willfully and deliberately committed an act of international terrorism, which caused the personal injuries of the Plaintiffs, all to their damage.

65. Pursuant to 18 U.S.C. § 2333(a), the Defendants aided and abetted ISIL through numerous acts detailed herein by knowingly providing it with substantial assistance to plan and carry out acts of international terrorism and to recruit and train terrorists inside Syrian territory.

66. Pursuant to 18 U.S.C. § 2333(a), (d), the Defendants conspired with ISIL and others to provide ISIL with substantial material support and resources, with the shared understanding, knowledge and intent that said support and resources would be used by ISIL to prepare and carry out acts of international terrorism.

67. For the reasons stated above, and having aided and abetted, provided substantial assistance to, and conspired with the terrorist organization that willfully and deliberately committed the act of international terrorism that caused the personal injuries of the Plaintiffs, Defendants are jointly and severally liable to Plaintiffs for all damages in this civil action.

**WHEREFORE**, Plaintiffs demand that judgment be entered, jointly and severally, against Defendants in the amount of **THIRTY MILLION U.S. DOLLARS ($30,000,000)**, in treble damages, for each of them, on this Count VII, and costs expended.

### COUNT VIII – PUNITIVE DAMAGES
### (Under 28 U.S.C. § 1605A(c), P.L. 104-208, 110 Stat. 3009-172)

68. Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in each of the foregoing paragraphs as if fully set forth.

69. The actions of ISIL and al-Baghdadi, as set forth above, were intentional and malicious, and in willful, wanton and reckless disregard of the rights and well-being of the Plaintiffs. All of the acts of ISIL and al-Baghdadi were facilitated by funding, training, and other material support, aid, assistance, resources and sponsorship provided by the Defendants.

70. Defendants rendered material support to al-Baghdadi and ISIL terrorists actually carrying out the terrorist acts above described. Under 28 U.S.C. § 1605A(c), Plaintiffs are

entitled to an award of economic damages, solatium, pain and suffering, as prayed for above and herein; and are further entitled to an award of punitive damages, designed to punish Defendants for their heinous sponsorship and support of terrorism over a prolonged period of time and for their heinous conduct in sponsoring and supporting the acts of terrorism that injured Plaintiffs, and caused irreparable harm, loss, pain, suffering, anguish, mental suffering and solatium to each of Plaintiff John Doe's family members, including Plaintiff Jane Doe, each of whom are entitled to an award of punitive damages against Defendants, and same is hereby requested against Defendants in accordance with the provisions of 28 U.S.C. § 1605A(c), making both a state that has been designated as a "State Sponsor of Terrorism" under § 6(j) of the Export Administration Act of 1979, and an official, employee, or agent of such a state, liable for economic damages, solatium, pain, and suffering, and punitive damages as to Plaintiff.

**WHEREFORE**, Plaintiffs demand that judgment be entered, jointly and severally, against Defendants in the amount of **ONE HUNDRED MILLION U.S. DOLLARS ($100,000,000)** on this Count VIII, and their costs expended. The award of punitive damages, as requested, is to punish Defendants for their conduct in supporting terrorism and the terrorist murderous acts described herein, and to send a message to them and others that the United States of America and its citizens will never countenance or ignore the lawless acts of terror and murder inflicted upon American victims of terrorism, and will respond to them with the application of orderly justice.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, request joint and several judgment against the Defendants as follows:

1. Awarding Plaintiffs compensatory and solatium damages against Defendants in amounts set forth herein and as shall be determined at trial;

2. Awarding Plaintiffs punitive or exemplary damages against Defendants according to proof to be presented at trial;

3. Awarding Plaintiffs prejudgment interest and post judgment interest as computed and calculated at the maximum rate allowable by law;

4. Awarding Plaintiffs their costs and disbursements and reasonable allowances of fees for counsel and experts and reimbursement of expenses;

5. Allowing a *lis pendens* notice of action to issue and be noted and enforced by the Court as against the Defendants and its instrumentalities;

6. Leave to amend this Complaint as interests of justice may allow; and

7. Granting any and all such further relief as the Court may deem just and proper.

Respectfully submitted,

Joseph V. Moreno (D.C. Bar No. 982257)
Robert Duncan (D.C. Bar No. 1045079)
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, DC 20001
Telephone: (202) 862-2200
Fax: (202) 862-2400
Joseph.Moreno@cwt.com
Robert.Duncan@cwt.com

Counsel for Plaintiffs

DATED: January 8, 2018