**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| JOHN DOE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 18-cv-0066 (KBJ) |
| | ) | |
| SYRIAN ARAB REPUBLIC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION ADOPTING**
**REPORT & RECOMMENDATION OF THE MAGISTRATE JUDGE**

Plaintiff John Doe was transiting through the Brussels International Airport in March of 2016, when a local cell of the Islamic State of Iraq and the Levant ("ISIS") detonated two explosives in the airport's departure hall.  (*See* Compl., ECF No. 4, ¶¶ 19–22.)  Doe survived this terrorist attack, but was allegedly severely injured.  (*See id.* ¶ 20.)  In the instant lawsuit—which has been filed against Defendants Syrian Arab Republic ("Syria") and the Syrian Military Intelligence ("SMI")—Doe, his wife, and their son (collectively "Plaintiffs") seek compensatory and punitive damages to account for the physical and mental injuries that they have suffered as a result of the horrific bombing.  (*See id.* at 18–19 ("Prayer for Relief").)

Because Syria and SMI failed to appear to defend themselves against this legal action, Plaintiffs filed a motion for default judgment.  (*See* Pls.' Mem. in Supp. of Mot. for Default J. ("Pls.' Mot."), ECF No. 31-1.)  The Court referred this matter to a Magistrate Judge for a Report and Recommendation ("R&R") on that motion (*see* Min. Order of Jan. 16, 2020), and before this Court at present is the R&R that the assigned

Magistrate Judge, G. Michael Harvey, has filed with respect to Plaintiffs' motion.  (*See* Report and Recommendation, ECF No. 37.)[1]  The R&R reflects Magistrate Judge Harvey's opinion that Plaintiffs' motion for default judgment should be granted, and that this Court should award a total of $42,000,000 in punitive and compensatory damages.  (*See id.* at 40.)

First, Magistrate Judge Harvey concludes that this Court has jurisdiction over this matter consistent with the Foreign Sovereign Immunities Act ("FSIA").  According to the R&R, this Court has subject-matter jurisdiction pursuant to section 1330(a) of Title 28 of the United States Code (*id.* at 11–12), given that "this lawsuit falls within the FSIA's 'terrorism exception' because Defendants provided material support and resources to ISIS, causing Plaintiffs' personal injuries as a result of an extrajudicial killing" (*id.* at 12–13; *see also id.* at 13–25 (detailing the evidence that Plaintiffs have offered with respect to the allegation that Defendants provided material support to ISIS, and concluding that this support was a legally sufficient cause of the terrorist attack)).  Additionally, Magistrate Judge Harvey explains that this Court has personal jurisdiction over Defendants pursuant to section 1330(b) of Title 28 of the United States Code, because effective service has been made through a diplomatic note in accordance with the FSIA requirements.  (*See id.* at 25–27.)

Next, Magistrate Judge Harvey determines that Plaintiffs have established three substantive bases for liability under viable tort causes of action.  (*See id.* at 28.)  According to the R&R, the elements of an assault have been sufficiently established:

---

[1] The redacted version of the Report and Recommendation, which is 41 pages long, is attached hereto as Appendix A.

"Defendants acted with intent to cause harmful contact and put John Doe in imminent apprehension" of such contact, and John Doe's "apprehension of harmful contact fully manifested itself" as a result of the explosions that "knocked him off his feet" and "caused him to lose consciousness."  (*Id.* at 29.)  In addition, Magistrate Judge Harvey concludes that John Doe has sufficiently established that Defendants are liable under a battery theory, because "acts of terrorism are, by their very nature, intended to harm[,]" and, "[a]s a result of the bombing, John Doe suffered from a wide array of injuries[.]" (*Id.* (cleaned up).)  Magistrate Judge Harvey further explains that "Jane Doe and their son [have] experienced severe emotional distress resulting from the attack[,]" and that "immediate family members of terrorism victims may state a claim for [intentional infliction of emotional distress] even if they were not present when the attack occurred."  (*Id.* at 30 (citing *Republic of Sudan v. Owens*, 194 A.3d 38, 42 (D.C. 2018)).)

Magistrate Judge Harvey also explains that Plaintiffs are entitled to compensatory damages (*see id.* at 31–36), and that punitive damages are proper in this case (*see id.* at 36–39).  With respect to John Doe's damages, the R&R compares this case to others involving terrorist attacks (*see id.* (citing *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 53 (D.D.C. 2007); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 84 (D.D.C. 2010); *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 92–93 (D.D.C. 2014)), and concludes that neither a downward departure nor an upward departure from the baseline award of $5,000,000 in compensatory damages that is routinely awarded to persons suffering substantial injuries in terrorist attacks is warranted (*see id.* at 34).  Additionally, Magistrate Judge Harvey recommends a

baseline solatium award of $4,000,000 to Jane Doe, for her "[m]ental anguish, bereavement, and grief" resulting from John Doe's injuries, which is consistent with past awards to spouses of injured victims of terrorist attacks (*id.* (quoting *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356–57 (D.C. Cir. 2018))), and a baseline solatium award of $1,500,000 to John and Jane Doe's son, which is also consistent with past awards to "children of surviving terrorism victims who experienced lasting emotional distress" (*id.* at 36 (citing *Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 157 (D.D.C. 2011))).  Citing other similar cases, Magistrate Judge Harvey also concludes that punitive damages are appropriate in this case (*see id.* at 37 (citing *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 55 (D.D.C. 2012))), and recommends that the Court follow one of the three standard approaches to calculating such damages: "multiply the total compensatory-damages award by a factor of between one and five" (*id.* at 38 (citing *Fritz v. Islamic Republic of Iran*, 324 F. Supp 3d 54, 65 (D.D.C. 2018))).  "Given the nature of the bombing, the Plaintiffs' injuries, and awards given in similar cases, the [Magistrate Judge] recommends . . . applying a multiplier of three[,]" for a total of $31,500,000 in punitive damages.  (*Id.* at 39.)

In addition to articulating these conclusions, the R&R also advises the parties in this case that any of them may file written objections to the findings and recommendations of the Magistrate Judge (*see id*. at 41), and it further explains that the failure to file timely objections might result in waiver of review of the matters addressed therein (*see id*.).  Under this Court's local rules, any party who objects to an R&R filed by a Magistrate Judge must file a written objection with the Clerk of the Court within 14 days of the party's receipt of the R&R.  *See* LCvR 72.3(b).  The due

date for objections to Magistrate Judge Harvey's R&R in the instant case has passed, and none have been filed.

This Court has reviewed Magistrate Judge Harvey's report, and agrees with its careful and thorough analysis and conclusions. Thus, the Court will **ADOPT** the Report and Recommendation in its entirety. Accordingly, Plaintiff's Motion for Default Judgment will be **GRANTED**, and the Court will enter judgment by default against Defendants and in favor of Plaintiffs in the amount of $42,000,000. This award consists of: $5,000,000 as compensatory damages for John Doe's injuries; $4,000,000 for Jane Doe's injuries; $1,500,000 for injuries to John and Jane Doe's son; and $31,500,000 as punitive damages. A separate Order accompanies this Memorandum Opinion.

DATE:  September 10, 2020

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>SYRIAN ARAB REPUBLIC, *et al.*,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No.: 1:18-cv-00066-KBJ<br>)<br>)<br>)<br>)<br>) |

MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

John Doe, Jane Doe[1], and their son (together, "Plaintiffs") brought this action under the state sponsor of terrorism exception ("terrorism exception") to the Foreign Sovereign Immunities Act ("FSIA"). 28 U.S.C. § 1605A. They seek compensatory and punitive damages to hold the Syrian Arab Republic ("Syria") and the Syrian Military Intelligence ("SMI") to account for the physical and mental injuries that they suffered as a result of the bombing of the Brussels International Airport on March 22, 2016. John Doe, a surviving victim of the airport bombing, seeks compensation for the physical injuries and pain and suffering he sustained as a result of the attack. His wife and son seek compensation for the emotional and psychological trauma the bombing caused them. Plaintiffs allege that the bombing was orchestrated by the Islamic State of Iraq and the Levant ("ISIS") with material support and resources from Syria. Plaintiffs filed a motion for default judgment when Syria and SMI failed to appear to defend this action. After

---

[1] The Court has permitted all Plaintiffs to proceed in this action anonymously. ECF No. 6.

thorough review of the record,[2] the undersigned recommends that Plaintiffs' motion be granted and that they be awarded $42 million in damages.[3]

## I.    BACKGROUND

### A.    John Doe

John Doe is a United States citizen who serves as a  ECF No. 30-1 at 31.[4]  On March 20, 2016, he arrived in Brussels, Belgium to testify ████████████████████████  *Id.* at 32.

His wife and 4-year-old son stayed behind in the United States.  *Id.* at 49, 195.  He was scheduled to depart the Brussels-Zaventem Airport at 10:10 a.m. on March 22, 2016.  *Id.* at 32.

He arrived at the airport at 7:45 a.m.; at approximately 7:58 a.m., as he was checking in, he heard a small explosion.  *Id.*

### B.    Brussels International Airport Bombing

On the morning of March 22, 2016, three individuals belonging to the Paris-Brussels ISIS cell detonated two explosives in the departure hall of the Brussels International Airport.  ECF No.

---

[2] The relevant docket entries considered by the undersigned are (1) Plaintiffs' Complaint (ECF No. 4); (2) Affidavit Requesting Foreign Mailing (ECF No. 6); (3) Certificate of Clerk Mailing Copy of Summons and Complaint to Syria (ECF No. 8); (4) Affidavit Requesting Foreign Mailing (ECF No. 12); (5) Certificate of Clerk Mailing Second Copy of Summons and Complaint to Syria (ECF No. 14); (6) Motion for Extension of Time to Serve Process (ECF No. 15); (7) Certificate of Clerk of Mailing Two Copies of the Summons, Complaint, and Notice of Suit to the U.S. Department of State (ECF No. 18); (8) Return of Service and Indicated Execution of Service under Diplomatic Notes (ECF No. 21); (9) Clerk's Entry of Default (ECF No. 23); (10) Motion for Default Judgment (ECF No. 30); and (11) Plaintiff John Doe's Supplemental Declaration (ECF No. 34-1). Citations to page numbers reflect the pagination assigned by the Electronic Case Filing system.

[3] Judge Jackson referred this case to the undersigned for a Report and Recommendation on Plaintiffs' motion for default judgment pursuant to Local Civil Rule 72.3(a)(3).

[4] The Court permitted the Plaintiffs to file their motion for default judgment and the underlying exhibits under seal because they contained personally identifiable information, including medical information, medical histories, social security numbers, dates of birth, and names. ECF No. 29 at 1-2; Minute Order dated January 16, 2020. A copy of this Report and Recommendation will be filed under seal and such personally identifiable information will be redacted from the version of this Report and Recommendation filed on the public docket.

30-1 at 15.  On the day of the Brussels attack, ISIS claimed responsibility through multiple print and online mediums.  *Id* at 124–5.  The airport bombing, along with a coordinated bombing of the Brussels Maelbeek Metro Station, killed over thirty people and injured over 300.  *Id.* at 124.

The first explosion knocked John Doe off his feet; the much closer, second explosion caused him to lose consciousness.  *Id.* at 32–33.  After he was carried out of the terminal, a doctor "provided [him] with first aid, including ████████████████████████████████ ████████████████████████████████  *Id.*  He was then able to re-enter the terminal to render aid to other injured passengers until he became too lightheaded to continue.  *Id.* at 33.  Approximately twenty minutes after the explosion, he was able to call his wife, Jane Doe, to inform her of the attack and his injuries.  *Id.*  Eventually, he was moved to a nearby fire station where "paramedics ████████████████████████████████████ ████████████████████  *Id.*

John Doe was subsequently transferred to a hospital in Brussels.  *Id.*  There he learned that he had not been evacuated from the airport sooner because "another attack had taken place at a Brussels metro station and that various other bomb threats had been called in across Brussels."  *Id.*  During triage, he was categorized as having a "class 1 injury" due to ████████████████████ ████████████████████████████████  *Id.* at 34.  Belgian doctors "removed ████████████████████████ []"" and subsequently transferred him to a private hospital to deal with his more complex injuries.  *Id.*  Once at the private orthopedic hospital, he underwent surgery in which the doctors ██████████ ████████████████████████████████ ████████████████████████████████  *Id.*  He remained under observation at the hospital for the next several days.  *Id.*

3

For her part, Jane Doe received a call from her husband in the early hours of March 22, 2016, waking her up from her sleep. *Id.* at 49. He explained to her "that there had been a terrorist attack at the airport as he was checking in at the Delta counter and that he had been wounded by shrapnel ████████████████████████ *Id.* He described to his wife a scene in the immediate aftermath of the bombing that was "totally uncontrolled and unsecured with many of the local law enforcement among the wounded." *Id.* He ended the call with one plea: "[Jane], get me out of here." *Id.* at 50.

After about an hour, John Doe called his wife again and she heard him say "[Jane], a secondary attack!" *Id.* at 51. He described a general scene of panic and running and, immediately before the line went dead, he yelled "No! No!!" *Id.* For forty minutes, Jane Doe sat thinking that she had just heard her husband die. *Id.* John Doe then called for a third time, confirming that he was alive. *Id.* He told his wife that he had been sheltering behind concrete barriers when first responders found a "large bomb that had not detonated with the others and ran for their lives telling all others to get away and take cover." *Id.* He waited in his foxhole with the first responders for another explosion which, thankfully, never came. *Id.* at 52.

Jane Doe booked the next flight to Amsterdam, but "agonized" about what to say to her four-year-old son, telling him that "Daddy had fallen down in Europe and Mommy was going to help him." *Id.* at 52. After arriving in Brussels, she agreed with John Doe's surgeon to book him into a nearby hotel so that he could peacefully recover and easily return to the hospital for wound care. *Id.* at 53. She "wept and prayed as [she] washed the caked and matted blood out of [her husband's] hair ████████████████████████ from under his nails, his shoulder, calf, forearms, and off every other spot [she] could find." *Id.* at 54. She observed "[t]he fine mist of blood particles that coated his glasses and the bits of gore and tissue in his ring were from the blast

4

and [her husband] later pulling people out of the building." *Id.* That night, she held her husband while he told her about the injuries he witnessed, including "one woman [who] was 'blown in half, just backwards' as she waited in line to check in at the same Delta counter where he was standing." *Id.*

## C.   The Aftermath

After he returned to the United States with his wife, John Doe received treatment in ████████████ ██████████████████████████████ *Id.* at 35. He was also seen by a ████████████ in ██████████, where he was diagnosed with ██████████████████ ██████████████████████████████████████ *Id.* at 35–36. At the time, his symptoms included ████████████████████████████████████████ ██████████████████████████████████████████ *Id.* at 36. He was also diagnosed with █████████████████████ *Id.* His ██████ ████████████████████████████████████ *Id.* at 37. To this day, he still ██████████████████████████ *Id.*

The effect of the bombing continues to impact John Doe's professional and personal life. *Id.* at 38. ████████████████████████████████████████████ ██████████████ *Id.* He "must ████████████████████ whenever the temperature falls below fifty degrees in order to avoid ████████████ *Id.* At the time the Complaint was filed, he was in the process of being ████████████████ due to his inability to meet required physical standards; this prevents him from serving the remaining five years necessary to vest his ██████ pension. *Id.* at 38–39. He has since ████████████████████████████

---
[5] ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ECF No. 34-1 at 2–3.  His inability to "earn a

▮▮▮▮▮ pension and the ancillary healthcare and retirement benefits that come with it will mean

a loss of millions of dollars to [him] and [his] family."  ECF No. 30-1 at 38–39.  According to

John Doe, more painful than the loss of the pension and its financial ramifications is the fact that

he will never again have ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ a

cost that "no amount of money will replace."  ECF No. 34-1 at 4.

In addition, John Doe continues to have significant ▮▮▮▮▮▮▮▮ causing

embarrassment at work and in social settings.  ECF No. 30-1 at 40.  His ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ *Id.* at 42.  He also continues to have ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ *Id.*  He has, as a result, become more ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 43.

As for his wife, during the first seven months back in the United States, John Doe needed

her in "an all-encompassing way."  *Id.* at 60.  Because of his injuries, he could not drive to his

daily medical appointments, manage his complex medications, recall past conversations, or

tolerate noise from their son.  *Id.*  Plaintiffs state that "[t]he day he was finally able to put on his

own pants was a victory of sorts that [they] celebrated on his long path to victory."  *Id.*  Because

John Doe was unable to care for himself after the bombing, his wife had to step away from her job

at ▮▮▮▮▮  *Id.*  The demanding nature of his injuries mean that their "whole existence as a

married couple narrowed to those long moments in [their] bathroom cutting strips of cloth and

packing, gently applying various washes and ointments in a sterile environment, waiting for the

overwhelming pain to subside so [they] could put his ▮▮▮▮▮▮▮▮▮ and start the

wrapping process anew." *Id.* at 62. Once Jane Doe was able to return to her job, she had lost all

of her seniority and transitioned to a new, less desirable role at an ███████████. *Id.* at 63. Two

years after the bombing, she had to again step away from work to deal with "the effect of the attack

on [their] young son, and the impact of the years of additional stress on [her] health . . ." *Id.*

████████████████████████████████████████████████████████

"the toll of the attacks and their aftermath on [Jane Doe's] physical and emotional health [have]

been incalculable." *Id.* She now suffers from ████████████████████████████████

████ *Id.* at 69. "Each time the world experiences a new terrorist or extremist attack it brings

back [her] own personal experience of Brussels attacks, the terror of thinking [her] husband had

been killed, the agony of needing to get him to a safe location with the appropriate medical care,

the decision to leave [her] son with [her] in-laws in order to reach [her] husband, watching [her

husband] suffer through months and years of treatment, holding [him] and [her son] through the

nightmares, and the change in [their] intimacy as a couple with all the ghosts in [their] marital

bed." *Id.*

The bombing and its aftermath also impacted their son. He was four years old when the

attack happened. *Id.* at 64. After his parents arrived back home from Brussels, he asked them

what had happened to his dad. *Id.* at 57. Although they told him that his father had "fallen down

in Europe and ████████████ their son clearly knew that something strange had occurred. *Id.*

He asked "[i]f you fell down why is your ████████ and "[i]f you fell on glass you would have

a cut and a Band-Aid. Your ████████████████████████ – why?" *Id.*

Months later, his parents would find out that their son was aware that his dad had been a victim of

terrorism. *Id.* By the fall, he was asking more pointed questions such as "[w]ho is responsible for

Dada falling down in Europe?" and "[w]hat is a terrorist?" *Id.* at 65.

In February of 2017, his preschool teacher reported that he told his classmates "that he was living with his grandparents and his daddy was having an operation ███████ because a terrorist shot him in Belgium." *Id.* Shortly after this incident, upon the suggestion from a child psychologist, his mother sat him down to explain exactly what happened in Brussels. *Id.* at 66. He was four years old at the time. *Id.* According to his clinical psychologist, he faced ██████ ████████████████████████████████████████████████████████████████████ ██████████████. *Id.* at 195–96. As a result of his parents struggling with emotional trauma, he also suffered from █████████████████. *Id.* at 196. This manifested during his play therapy, where █████████████████████████████████████████████ ██████████████████ *Id.* Although the permanency of this trauma is unclear, their son continues to struggle with ████████████████████████████ *Id.*

## II.    LEGAL STANDARD

The Federal Rules of Civil Procedure establish a two-step process for entry of default judgment. Fed. R. Civ. P. 55(b)(2); *see also Bricklayers & Trowel Trades Int'l Pension Fund v. KAFKA Constr., Inc.*, 273 F. Supp. 3d 177, 179 (D.D.C. 2017). First, a plaintiff must request that the Clerk of the Court enter default against a defendant for failing to "plead or otherwise defend." *Bricklayers* 273 F. Supp. 3d at 179 (quoting Fed. R. Civ. P. 55(a)). The plaintiff may then move for a default judgment against the absent defendant. *Bricklayers*, 273 F. Supp. 3d at 179 (citing Fed. R. Civ. P. 55(b)).

Default judgment is available only when "the adversary process has been halted because of an essentially unresponsive party." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (internal quotation marks omitted). "[D]efault judgment is warranted if a defendant is a 'totally unresponsive' party and its default is plainly willful, as reflected by its failure to respond, 'either

to the summons and complaint, the entry of default, or the motion for default judgment.'" *District of Columbia v. Butler*, 713 F. Supp. 2d 61, 64 (D.D.C. 2010) (quoting *Gutierrez v. Berg Contracting, Inc.*, No. 99–3044 (TAF), 2000 WL 331721, at *1 (D.D.C. Mar. 20, 2000)). However, a notation of default by the Clerk of the Court against an unresponsive defendant does not automatically entitle a plaintiff to default judgment. Rather, it is appropriate only if the complaint's well-pleaded allegations, accepted as true, state an adequate claim for relief. *See Marmaras v. Marafatsos*, No. 18-1236 (CKK), 2019 WL 3414363, at *2 (D.D.C. July 29, 2019); *Jackson v. Corr. Corp. of Am.*, 564 F. Supp. 2d 22, 26–27 (D.D.C. 2008). In other words, entry of default "'establishes the defaulting party's liability for the well-pleaded allegations of the complaint,' but not for allegations that are not sufficiently pleaded." *United States v. $6,999,925.00 of Funds Associated with Velmur Mgmt. Pte Ltd*, 368 F. Supp. 3d 10, 17 (D.D.C. 2019) (quoting *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011)). In that way, "[c]onceptually, . . . a motion for default judgment is like a reverse motion to dismiss for failure to state a claim." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015).

Before a default judgment can be entered against a foreign sovereign, the FSIA requires a plaintiff to establish his or her "claim or right to relief by evidence satisfactory to the court." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016) (quoting 28 U.S.C. § 1608(e)). A court must thoroughly review a plaintiff's allegations and evidence against an absent foreign sovereign. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014); *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 16–17 (D.D.C. 2016). While a court "may not unquestioningly accept a complaint's unsupported allegations as true," *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012), "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true," *Thuneibat*, 167 F. Supp.

9

3d at 33; *see also Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015). An evidentiary hearing is not required; rather, a "plaintiff may establish proof by affidavit." *Reed*, 845 F. Supp. 2d at 212; *see also Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005) ("In the absence of an evidentiary hearing, although the plaintiffs retain 'the burden of proving personal jurisdiction, [they] can satisfy that burden with a *prima facie* showing.' . . . [T]hey may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." (first alteration in original) (quoting *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991))). Due to the nature of cases brought under the FSIA's terrorism exception, "[t]he testimony of expert witnesses is of crucial importance because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain." *Owens v. Republic of Sudan*, 864 F.3d 751, 787 (D.C. Cir. 2017) (internal citations omitted), *vacated in part on other grounds sub nom. Opati v. Republic of Sudan*, __ U.S. __, 140 S. Ct. 1601 (2020). The court may also "take judicial notice of related proceedings and records in cases before the same court." *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 43 (D.D.C. 2008).

Additionally, "the procedural posture of a default does not relieve a federal court of its 'affirmative obligation' to determine whether it has subject-matter jurisdiction over the action." *Warmbier v. Dem. People's Rep. of Korea*, 356 F. Supp. 3d 30, 42 (D.D.C. 2018) (quoting *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996)). The party seeking the judgment must demonstrate that the court has both subject matter jurisdiction over the action and personal jurisdiction over the absent defendant. *See Mwani*, 417 F.3d at 6; *Thuneibat*, 167 F. Supp. 3d at 33. Nevertheless, "[e]ven if there are sufficient contacts for a court to assert personal jurisdiction over a defendant, it lacks power to do so unless the procedural requirements of

effective service of process are satisfied." *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 514 (D.C. Cir. 2002).

If a court deems default judgment appropriate, it must independently determine the appropriate remedies. *See SEC v. Analytica Bio-Energy Corp.*, 317 F. Supp. 3d 574, 578 (D.D.C. 2018); *Pescatore v. Palmera Pineda*, 345 F. Supp. 3d 68, 70 (D.D.C. 2018) ("[U]nless the amount of damages is certain, the court is required to make an independent determination of the sum to be awarded." (quoting *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001))). That is, unlike a plaintiff's well-pleaded allegations as to liability, a court does not take factual allegations related to damages as true. *See, e.g.*, *U.S. Commodity Futures Trading Comm'n v. Bühler-Miko*, No. 12-cv-0795 (CKK), 2014 WL 12804923, at *3 (D.D.C. Jan. 27, 2014). Rather, a court makes its damages determination "in light of the facts and the circumstances of the case at hand." *SEC v. Whittemore*, 691 F. Supp. 2d 198, 209 (D.D.C. 2011). In so doing, a court "may rely on detailed affidavits or documentary evidence." *Int'l Painters & Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC*, 531 F. Supp. 2d 56, 58 (D.D.C. 2008). "While the court may conduct a hearing to fix the amount of damages, it is not required to do so, 'as long as it ensure[s] that there [is] a basis for the damages specified in the default judgment.'" *SEC v. China Holdings, Inc.*, No. 09-2045 (JDB), 2010 WL 11603046, at *2 (D.D.C. Sept. 24, 2010) (alterations in original) (quoting *Carpenters Labor-Mgmt. Pension Fund v. Freeman-Carder LLC*, 498 F. Supp. 2d 237, 240 (D.D.C. 2007)).

## III.   DISCUSSION

### A.   Subject Matter Jurisdiction

Section 1330(a) of Title 28 of the United States Code grants district courts original subject matter jurisdiction "without regard to amount in controversy" over (1) nonjury civil actions (2) as

to any claim for relief *in personam* (3) against a foreign state (4) provided that the foreign state is not entitled to immunity under sections 1605–1607 of the FSIA. *See* 28 U.S.C. § 1330(a); *see also Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017); *Reed*, 845 F. Supp. 2d at 210.

The first three prerequisites are easily met here. First, Plaintiffs have brought a nonjury civil action. ECF No. 4 at 1. Second, this is an action seeking relief *in personam*, rather than *in rem*. *See Thuneibat,* 167 F. Supp. 3d at 34 (holding that a lawsuit seeking damages from Syria to compensate for a suicide bombing is seeking *in personam* relief). Third, Syria is a foreign sovereign. *Id.* at 33. Regarding SMI, courts in this District have held that it is a political subdivision of Syria and may be treated as the foreign state itself for the purposes of an action under the FSIA's state-sponsored terrorism exception. *See Thuneibat,* 167 F. Supp. 3d at 34 (holding that the Syrian Military Intelligence is considered part of the state under the FSIA); *Gates v. Syrian Arab Republic*, 646 F.3d 1, 2 n.1 (D.C. Cir. 2011) (same); *see also Azadeh v. Government of Islamic Republic of Iran,* 318 F. Supp. 3d 90, 90 n.2 (D.D.C. 2018) (citing a 2010 district court case to support the conclusion that the Islamic Revolutionary Guard is a political subdivision of Iran). Indeed, SMI is the "most important intelligence organ in Syria" and is "in charge of terrorist groups." *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 62 (D.D.C. 2008) (internal quotation marks omitted).

The fourth requirement for subject matter jurisdiction—that Defendants are not entitled to foreign sovereign immunity because the case falls within one of the FSIA's exceptions—requires further analysis. Plaintiffs contend that this lawsuit falls within the FSIA's "terrorism exception" because Defendants provided material support and resources to ISIS, causing Plaintiffs' personal

injuries as a result of an extrajudicial killing.  *See* 28 U.S.C. § 1605A(a)(1); ECF No. 30-1 at 8,

14–15.  The terrorism exception provides that:

> A foreign state shall not be immune from the jurisdiction of courts of the United
> States or of the States in any case . . . in which money damages are sought against
> a foreign state for personal injury or death that was caused by an act of torture,
> extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material
> support or resources for such an act . . . .

28 U.S.C. § 1605A(a)(1).  In order for an FSIA claim to be heard in federal court, the victim

seeking relief under this exception must prove that (1) "the foreign state was designated as a state

sponsor of terrorism at the time the act . . . occurred," § 1605A(a)(2)(A)(i)(I); and (2) "the claimant

or the victim was, at the time the act . . . occurred a national of the United States," 28 U.S.C.

§ 1605A(a)(2)(A)(ii)(I)[6].  For a foreign sovereign's immunity to be nullified, the plaintiff must

also (3) seek monetary damages "for personal injury or death caused by 'torture, extrajudicial

killing, aircraft sabotage, [or] hostage taking"; and (4) the act, or the provision of material support

or resources for the act, is engaged in by an official, employee, or agent of the defendant.

*Mohammad v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015) (quoting 28 U.S.C. §

1605A(a)(1)).  Each requirement will be addressed in turn.

### 1.    State Sponsor of Terrorism

First, Syria was designated a state sponsor of terrorism on December 29, 1979, and has

remained so designated since that date, including in 2016 when the Brussels Airport bombing

occurred. U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-

---

[6] Section 1605A(a)(2)(A)(iii) also requires that, in a case in which the act occurred in the foreign state against which
the claim has been brought, the claimant must afford the foreign state a "reasonable opportunity to arbitrate the claim
in accordance with the accepted international rules of arbitration."  Because the attack at issue here occurred in
Brussels, the Plaintiffs do not need to satisfy the arbitration requirements. ECF No. 30 at 8; *see also Thuneibat*, 167
F. Supp. 3d at 35 (holding that the plaintiffs did not need to satisfy the third arbitration requirement because they
brought suit against Syria for a terrorist attack that occurred in Jordan).

of-terrorism/ (last visited July 22, 2020).  Further, as noted previously, SMI is treated as part of the Syrian government under the FSIA.  *See Thuneibat*, 167 F. Supp. 3d at 33.

### 2.  Citizenship Requirement

Second, Plaintiffs are both natural born U.S. citizens and were U.S. citizens at the time of the bombing.  ECF No. 30-1 at 46, 72.

### 3.  Extrajudicial Killing

An "[e]xtrajudicial killing" is defined for purposes of the FSIA (by means of the Torture Victim Protection Act of 1991) as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any killing that, under international law, is lawfully carried out under the authority of a foreign nation."  Torture Victim Protection Act, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1991) (codified at 28 U.S.C. § 1350 note); 28 U.S.C. § 1350(3)(a); *see also* 28 U.S.C. § 1605A(h)(7).  The D.C. Circuit has interpreted this text to include three elements: "(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a constituted court."  *Owens*, 864 F.3d at 770.  A suicide bombing in a crowded airport that resulted in many deaths would plainly meet those requirements.  ECF No. 30-1 at 15.  The plaintiffs "need only establish that the bombing here was authorized, deliberate, and that there were casualties.  It is not necessary, however, for one of the plaintiffs to have died in the attack in order for the state-sponsor-of-terrorism exception to apply."  *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017); *see also, Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 58 (D.D.C. 2019) (collecting cases); *Salzman v. Islamic Republic of Iran*, No. 17-cv-2475 (RDM), 2019 WL 4673761, at *12 (D.D.C. Sept. 25, 2019) (finding that, although plaintiffs survived, their injuries resulted from an

extrajudicial killing because five others died in the same attack); *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 11 (D.D.C. 2011) (finding injuries were caused by an extrajudicial killing because a van loaded with explosives was deliberately driven into a bus with the intent to kill civilians, despite plaintiff's survival). .

      4.    Material Support

"In order to establish the court's jurisdiction, the plaintiffs in this case must show (1) [Syria] provided material support to [ISIS] and (2) its material support was a legally sufficient cause of the [ ] bombings." *Owens*, 864 F.3d at 778; *see, e.g.*, *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 135-36 (D.D.C. 2019); *Ben-Rafael*, 540 F. Supp. 2d at 46. A federal criminal statute defines material support or resources as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b)(1); *see* 28 U.S.C. § 1605A(h)(3) (defining "material support or resources" for the purposes of the FSIA to have the "meaning given that term in section 2339A of title 18.").

As a threshold matter, the undersigned finds that the Plaintiffs have presented sufficient evidence that ISIS was responsible for the Brussels Airport bombing. ISIS issued several claims of responsibility for the attack, including in a French and Arabic communiqué via telegram, online videos, and ISIS' English-language publication, *Dabiq*. ECF No. 30-1 at 124–31. Further, expert testimony proffered by the Plaintiffs opines that the formatting of the communiqués is consistent with ISIS' past claims of responsibility for terrorist attacks. *Id.* at 124–28 (finding that the communiqué was authentic due to the presence of a distinct logo and similarity to previous

communiqués following similar attacks).  ISIS has also produced internet propaganda glorifying the bombing.  *Id.* at 131 ("al-Hayat Media Center released a French language video titled 'My Revenge,' featuring clips of the Brussels attackers, and a chant blaming the Belgian government for the attack.").  Lastly, Najim Laachraoui, one of the Brussels bombers, had significant connections to ISIS.  *Id.* at 134–37.  He served as a foreign fighter for ISIS in Syria; a Belgian prisoner identified him as her guard while she was in ISIS captivity; and he received help from explosives experts located in Syrian ISIS bases to build the explosives used in the Brussels Airport attack.  *Id.*  Similar evidence has been deemed sufficient in other default cases to demonstrate a terrorist group's responsibility for an attack.  *See, e.g., Force v. Islamic Republic of Iran*, __ F. Supp. 3d __, __, 2020 WL 2838527, at *9 (D.D.C. 2020) (finding Hamas responsible for a terrorist attack when the background of the perpetrator revealed influences by Hamas ideology and connections to Hamas members); *Thuneibat* 167 F. Supp. 3d at 30 (finding Al-Qaeda in Iraq responsible for a terrorist attack based on claims of responsibility it made shortly after the attack); *Gates*, 580 F. Supp. 2d at 58 (finding that al Qaeda publishing propaganda on the Internet glorifying beheading videos indicated their responsibility for the attack); *Gates*, 580 F. Supp. 2d at 58 (finding statements claiming responsibility exhibiting consistent formatting to past claims weigh in favor of a terrorist organization's responsibility for the attack).

Plaintiffs have also provided satisfactory proof, at the default stage, that Syria provided material support and resources to ISIS.  Although the undersigned is aware of no case addressing this precise question, this Court has found that Syria provided material support to ISIS' predecessor, Al-Qaeda in Iraq ("AQI").  *See Thuneibat* 167 F. Supp. 3d at 36 ("The plaintiffs have supplied satisfactory proof that the defendant provided material support to Zarqawi and AQI, enabling them to perpetrate these attacks."); *Gates*, 580 F. Supp. 2d at 67-68 ("Syria in fact did

16

provide material support and resources to Zarqawi and al-Qaeda in Iraq . . . ."). In those cases, and others, plaintiffs have relied on expert testimony and government reports, as Plaintiffs have here, to demonstrate the foreign state's material support of the terrorist organization at issue. *See generally Force*, __ F. Supp. 3d at __, 2020 WL 2838527, at *3 ; *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 125 (D.D.C. 2019); *Thuneibat*, 167 F. Supp. 3d at 28; *Gates*, 580 F. Supp. 2d at 56; *Ben-Rafael*, 540 F. Supp. 2d at 47.

Although evidence found sufficient to demonstrate a foreign sovereign's material support of a terrorist organization varies, successful showings have generally focused on the foreign state's offer of safe haven to the terrorist group, provision of financing, weapons, or assistance with its recruitment, or motive to foment unrest in a particular area where the group is operating. *See generally W.A*, 427 F. Supp. 3d at 136 (finding that Iran provided material support to the Badr Organization through support of efforts to overthrow Sunni rule in Iraq and direct funding); *Thuneibat* 167 F. Supp. 3d at 36 (finding Syria provided material support to AQI by allowing it to operate and plan terrorist attacks from within Syria by providing essential financing to the group); *Gates*, 580 F. Supp. 2d at 68–69 (finding Syria provided material support to AQI by offering it a safe haven for its operations, and by supporting its training and recruitment efforts); *Ben-Rafael*, 540 F. Supp. 2d at 45 (finding that Iran provided material support to Hezbollah by funding training camps). In *Force*, for example, this Court held that Syria provided material support to Hamas by historically providing a safe haven for its operations and arms smuggling. __ F. Supp. 3d at __, 2020 WL 2838527, at *7. Despite a strained relationship at the time of the attacks, the Court held that Syria's historic support of Hamas allowed it to solidify its organizational structure and the sophisticated operations necessary to undertake terrorist attacks. *Id*. The Court reasoned that this symbolic validation led to Hamas' growth, status, credibility, and rise in sophistication. *Id*.

Plaintiffs rely on the declaration of Dr. Daveed Gartenstein-Ross[7], which places heavy emphasis on reports from the U.S. Department of State, U.S. Department of Treasury, ally foreign state reports, and interviews with those having expertise in ISIS' organizational tactics. ECF No. 30-1 at 83–139. In this case, Dr. Gartenstein-Ross outlines the significant history of Syria's support for ISIS' predecessor, AQI. He attests that the "Islamic State (ISIS) is the most recent iteration of the 'Zarqawi organization,' a militant group that has undergone several name changes since its emergence in the early 1990s." *Id.* at 83. In April of 2013, Abu Bakr al-Baghdadi announced that the Zarqawi organization would unify under his leadership under the entity name of the Islamic State of Iraq and al-Sham (that is, ISIS). *Id.* at 93. Based on first-hand interviews with regime defectors and captors, and official statements from U.S. officials, Dr. Gartenstein-Ross avers that Syria provided active support to AQI in the pre-Arab Spring era. *Id.* at 101. Beyond a generally permissive attitude toward the terrorist organization, the Syrian government was "part of an operation to smuggle jihadist volunteers into Iraq from Syria after the 2003 invasion." *Id.* (quoting Ruth Sherlock, "Syria's Assad Accused of Boosting al-Qaeda With Secret Oil Deals," *Telegraph* (U.K.), January 20, 2014. David Schenker, an official from the Office of the Secretary of Defense, testified in *Gates v. Syrian Arab Republic* that "in the months prior to the [U.S.] invasion, the Assad regime allowed the establishment of an [AQI] office across the street

---

[7] The undersigned finds that Dr. Gartenstein-Ross is qualified as an expert in the areas of terrorism and jihadist groups. He has been qualified in federal courts on six occasions in those fields. In addition, he has also testified in five hearings directly related to ISIS before the U.S. House and Senate. He has taught related topics at Georgetown University, Catholic University, University of Southern California, and University of Maryland. He received his Ph.D. and M.A. in World Politics from Catholic University and a J.D. from New York School of Law. As a result of his work, Dr. Gartenstein-Ross has been certified by governmental organizations as an expert on terrorism and jihadist groups, including the U.S. Customs and Border Protection and the U.S. Department of Defense's Joint Improvised-Threat Defeat Organization. He is presently the Chief Executive Officer of Valens Global, a firm focused on responses to violent non-state actors, a Senior Advisor on Asymmetric Warfare at the Foundation for Defense of Democracies, and an Associate Fellow at the International Centre for Counter-Terrorism. He also served as a Senior Advisor to the Director of the U.S. Department of Homeland Security's Office for Community Partnerships from 2016-2017. ECF No. 30-1 at 75-78.

from the U.S. Embassy in Damascus where would-be insurgents could sign up and board a bus to travel to Baghdad." *Id.* at 102 (quoting David Schenker testimony). Further, AQI recruiter Abu Qaqaa maintained a strong relationship with the Syrian regime, confirmed by "the confession of Mohammed Hassan al-Shemari, the head of AQI in Diyala province." *Id.* at 103. Shemari said that he had "received training from 'a Syrian intelligence agent called Abu al-Qaqaa.'" *Id.* (quoting Muhanad Mohammed, "Iraq al Qaeda Militant Says Syria Trained Him," Reuters, August 30, 2009; Al-Iraqiyah television (Arabic), August 30, 2009). Syria maintained a very close relationship with this known AQI recruiter, and, by the time of his assassination in 2007, he was considered "to be an agent of the Syrian state." *Id.* at 102.

Again, similar testimony has been found sufficient in FSIA cases to demonstrate Syria's material support of AQI. *See Thuneibat* 167 F. Supp. 3d at 36 (finding that Syria materially supported AQI through establishing a transit pipeline for foreign fighters and allowing AQI to operate unmolested within Syria); *Gates*, 580 F. Supp. 2d at 69 (finding that Syria materially supported AQI by providing a logistical hub for its operations and supporting its recruitment efforts by including the aforementioned AQI recruiter Abu Qaqa[a] on the Syrian payroll). Plaintiffs offer evidence that this historical support, much as in *Force*, allowed for the rise in status and sophistication of modern-day ISIS. ECF No. 30-1 at 105 ("Over the past decade, the Assad regime's permissive attitude towards al-Qa'ida and their terrorist groups' foreign terrorist fighter facilitation efforts during the Iraq conflict in turn fed the growth of al-Qa'ida, ISIS, and affiliated terrorist networks inside Syria.") (quoting U.S. Department of State, *Country Reports on Terrorism 2017, Chapter 2: State Sponsors of Terrorism*, https://www.state.gov/reports/country-reports-on-terrorism-2017 (last visited July 22, 2020)). Dr. Gartenstein-Ross also highlights three ways in which Syria either tacitly or explicitly supported the growth of ISIS in the post–Arab

19

Spring era: by providing a general safe haven for its operations in Syria, by releasing key ISIS members from Syrian prisons, and by providing significant financial assistance via the purchase of oil from ISIS.  ECF No. 30-1 at 105.

Citing U.S. Department of State reports and statements from government officials, Dr. Gartenstein-Ross avers that Syria's government has allowed ISIS to operate unmolested within Syrian borders.  *Id.* at 105.  The September 2018 U.S. Department of State *Country Reports on Terrorism* highlighted that Assad's regime in Syria has been historically permissive towards terrorist groups, which allowed the ISIS networks in Syria to grow.  U.S. Dep't of State, *Country Reports on Terrorism 2018, Chapter 2: State Sponsors of Terrorism,* https://www.state.gov/reports/country-reports-on-terrorism-2018/ (last visited July 22, 2020).  The Report goes on to highlight that the Syrian regime's permissiveness allowed ISIS to plot, plan, and inspire many terrorist operations abroad from within Syrian borders.  *Id.*  This Report is further supported by public statements by government officials who have a basis for knowledge of Syria's support of ISIS.  Both former French President Francois Hollande and former U.S. Secretary of State John Kerry, for example, have publicly stated that Syria has a strategy of negligence towards, and de facto allyship with, ISIS.  ECF No. 30-1 at 114.

Moreover, Dr. Gartenstein-Ross asserts that Syria's support of ISIS is made evident by its release of jihadists from a prominent Syrian prison.  He supports this testimony with previous scholarly work and statements from former officials in the Syrian government.  *Id.* at 106-13.  In 2011, Syrian President Assad released many inmates from Sednaya prison.  *Id.* at 106.  A former member of Syrian parliament identified the prison as "an incubator for jihadists."  *Id.* (quoting Mohammed Habash, "Radicals Are Assad's Best Friends," *The National* (UAE), https://www.thenational.ae/radicals-are-assad-s-best-friends-1.308145 (last visited July 22,

2020)).  A former Syrian regime official identified this policy of prisoner release as "a policy on the part of Mr. Al Assad's forces to create violence and terrorism to legitimize a crackdown on the opposition" that came directly from SMI headquarters.  ECF No. 30 at 106 (quoting Phil Sand et al., "Assad Regime Abetted Extremists to Subvert Peaceful Uprising, Says Former Intelligence Official," *The National* (UAE), https://www.thenational.ae/world/assad-regime-abetted-extremists-to-subvertpeaceful-uprising-says-former-intelligence-official-1.319620 (last visited July 22, 2020)).  This prisoner release included many jihadists who rose to become prominent members of ISIS' leadership. ECF No. 30-1 at 107–13.  Dr. Gartenstein-Ross also cites to Scholar Charles Lister who has explained that Syria's prison release effectually created a full-fledged Syrian wing of ISIS due to the pre-existing network in Syria.  *Id.* at 113 (citing Kathy Gilsinan, "How Syria's Uprising Spawned a Jihad," *The Atlantic*, https://www.theatlantic.com/international/archive/2016/03/syria-civil-war-five-years/474006/ (last visited July 22, 2020)).

Even more directly, Dr. Gartenstein-Ross attests that ISIS received a significant revenue stream from Syria's purchase of oil ISIS seized in the region. ECF No. 30-1 at 115.  His conclusion is supported by statements from U.S. officials and the State Department's Reports on Terrorism. *Id.* at 115–21.  In 2014, ISIS captured strategic oil fields and refineries in Syria and Iraq.  *Id.* at 117. The United States Under Secretary for Terrorism and Financial Intelligence, David S. Cohen, highlighted that ISIS tapped into long-standing black-market systems to sell this oil, which could not legally be sold on the open market, to Syria (among other buyers).  *Id.* at 115, 117-18 (citing David S. Cohen, "Attacking ISIL's Financial Foundation," Public Remarks, Carnegie Endowment for International Peace, Washington, D.C., October 23, 2014, https://www.treasury.gov/press-center/press-releases/Pages/jl2672.aspx).  The U.S. State Department's Country Reports on Terrorism further highlight that the Syrian regime's purchase of oil from ISIS through

intermediaries provided the terrorist group with valuable revenue. ECF No. 30-1 at 118 (citing U.S. Dep't of State, *Country Reports on Terrorism 2017, Chapter 2: State Sponsors of Terrorism*,, https://www.state.gov/reports/country-reports-on-terrorism-2017/ (last visited July 22, 2020)). Dr. Gartenstein-Ross's report cites an analyst who estimated Assad's regime was purchasing up to 20,000 barrels of oil a day from ISIS. ECF No. 30-1 at 124. His opinion also relies on his interview with General Terry Wolff (ret.), who previously served on the Deputy Special Presidential Envoy for the Global Coalition to Defeat ISIS. General Wolff asserts that, in 2014 and 2015, Syria was also purchasing oil *directly* from ISIS through its pipelines, rather than through the black market. *Id.* at 119-20.

Syria's support of ISIS is further reinforced by interviews with ISIS defectors who personally witnessed Syrian regime engineers repairing ISIS pipelines in 2015 so that oil could be delivered to the regime. *Id.* at 120–21 (citing Anne Speckhard & Ahmet S. Yayla, "ISIS's Revenues Include Sales of Oil to the al-Assad Regime," *ICSVE Brief Report*, http://www.icsve.org/brief-reports/isiss-revenues-include-sales-of-oil-to-the-alassad-regime/ (last visited July 22, 2020)). Syria's financial partnership with ISIS is also evidenced by documents found during a 2016 raid of an ISIS oil tycoon, which demonstrated that ISIS already had "agreements allowing trucks and pipeline transit from [Syrian] regime-controlled fields through Islamic State-controlled territory." ECF No. 30-1 at 121 (citing Benoit Faucon & Margaret Coker, "The Rise and Deadly Fall of Islamic State's Oil Tycoon," *Wall Street Journal*, https://www.wsj.com/articles/the-rise-and-deadly-fall-of-islamic-states-oil-tycoon-1461522313 (last visited July 22, 2020)). The documents obtained from this raid further highlighted that both Syria and ISIS considered their partnership to be important. ECF No. 30-1 at 121. Similarly, in 2018, the U.S. Treasury identified a company responsible for the import and export activities in

Syria as "the exclusive agent for providing supplies to ISIS-controlled areas, including oil and other commodities." ECF No. 30-1 at 125 (quoting U.S. Department of the Treasury, press release, "U.S. Treasury Imposes Sanctions on Assad Regime's Key ISIS Intermediary and a Petroleum Procurement Network," September 6, 2018, https://home.treasury.gov/news/pressreleases/ sm474). Together, this proffer of evidence is sufficient at the default stage to establish that Syria provided material support and resources to ISIS.

Plaintiffs have also shown that Syria's material support of ISIS was a legally sufficient cause of the Brussels Airport suicide bombing. *See Owens*, 864 F.3d at 778 (requiring plaintiffs to show that the foreign sovereign's material support is a legally sufficient cause of the terrorist attack at issue). Importantly, Plaintiffs need not demonstrate that Syria specifically intended to cause the Brussels attack; they need only show proximate cause—that is, "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128-29 (D.C. Cir. 2004) (quoting *Prosser & Keeton on the Law of Torts* 263 (5th ed. 1984)); *see W.A*, 427 F. Supp. 3d at 136; *Ben-Rafael*, 540 F. Supp. 2d at 54. In order to establish this causal connection, defendant's actions must be a "substantial factor" in the sequence of events that caused the plaintiff's injury and the injury must be a "reasonably foreseeable consequence" of defendant's conduct. *Owens*, 864 F.3d at 794. As noted, in previous FSIA cases, evidence found to sufficiently prove that a foreign state's actions were a "substantial factor" in the sequence of events culminating in the plaintiff's injuries included financial support for the terrorist organization, logistical support for insurgent training, provision of weapons, and bolstering of operational capacity. *See generally Force*, __ F. Supp. 3d at __, 2020 WL 2838527, at *29 (finding Iran's support of Hamas was a substantial factor in the terrorist attack because it provided financial and

military aid crucial to the terrorist organization's operating capacity); *Salzman*, 2019 WL 4673761, at *13 (finding Iran's support of Hamas to be a substantial factor in a suicide bombing because it provided critical financial support and support of Hamas' training efforts); *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 48 (D.D.C. 2019) (finding Iran's support of Saraya al-Salam to be a substantial factor in a hostage-taking because it provided weapons, money, and training). Through expert testimony, Plaintiffs have shown that Syria's aid to ISIS was essential to strengthening the group's operating capacity. ECF No. 30-1 at 138. The Syrian regime knowingly facilitated a prisoner release that included many jihadists who rose to become prominent members of ISIS' leadership. *Id.* at 107-13. Syria also knowingly provided ISIS safe-haven and oil revenue, which were crucial to its maintenance and financing of the Amniyat al-Kharji, the subsection of the ISIS security state responsible for organizing, supporting and financing attacks across the globe, including the Brussels Airport bombing. *Id.* at 131-34.

Plaintiffs' injuries were also a reasonably foreseeable consequence of Syria's actions supporting ISIS. *See Roth,* 78 F. Supp. 3d at 394 (stating that the FSIA sets a relatively low bar for proximate cause). In previous cases, sufficient evidence of foreseeability included backing the organization despite knowledge of their violent tactics and encouragement of an escalation of terrorist behavior. *See id.* (finding injuries as a result of a bombing were a foreseeable result of Iran's material support of a terrorist organization because Iran encouraged an increase in terrorist activities); *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 228 (D.D.C. 2012) (finding injuries as a result of a kidnapping were a foreseeable result of Syria's support of PKK because Syria bankrolled the organization, knowing that they utilized violent tactics). Here, Syria's support of ISIS' predecessor, AQI, resulted in increased violence. ECF No. 30-1 at 94–104. Nevertheless, Syria took all of the steps discussed above to support the growth of ISIS, AQI's successor. Further,

24

Plaintiffs presented expert testimony that the Syrian regime released known jihadists, who became senior ISIS leaders, for the purpose of increasing extremism and terrorism and legitimizing the Assad regime's crackdown on its dissenters. *Id.* at 106.

For these reasons, the undersigned finds that this Court has subject-matter jurisdiction over this action.

### B.    Personal Jurisdiction

The undersigned next examines if effective service has been made pursuant to 28 U.S.C. § 1330(b), which governs personal jurisdiction over foreign states. That section provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title." *Id.* Service is made on a foreign state under section 1608 in one of four ways:

(1)    by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

(2)    if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

(3)    if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

(4)    if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services— and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a

certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a). The methods of service outlined in section 1608(a) are listed in order of preference; plaintiffs must attempt the first method before proceeding to the next. *Angellino v. Royal Family Al-Saud*, 681 F.3d 463, 465–66 (D.C. Cir. 2012). "[S]trict adherence to the terms of 1608(a) is required" and "neither substantial compliance, nor actual notice, suffice[s] under section 1608(a)(3) because Congress had mandated 'service of the Ministry of Foreign Affairs, the department most likely to understand American procedure.'" *Barot v. Embassy of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015) (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994)).

Taking section 1608(a)'s methods of service in order, the Defendants neither have a special arrangement for service with the Plaintiffs, which would trigger service under section 1608(a)(1), nor has Syria entered into any international convention governing service of judicial documents as would trigger service under section 1608(a)(2). *See Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 155 (D.D.C. 2019) (holding that Syria is not a party to any international convention on service of legal documents); *Thuneibat*, 167 F. Supp. 3d at 37 (same); *Gates*, 580 F. Supp. 2d at 66 (same). As a result, Plaintiffs attempted to serve the Defendants pursuant to section 1608(a)(3) and (a)(4).[8] Accordingly, on March 22, 2018, Plaintiffs filed a request for service on Syria and SMI by mailing through DHL pursuant to section 1608(a)(3). ECF No. 12; ECF No. 13; *see also Thuneibat*, 167 F. Supp. 3d at 38 (finding service sufficient on Syria and SMI under section

---

[8] It appears that Plaintiffs sought to skip attempting mail service through section 1608(a)(3), presumably because they thought it would be futile. Had they done so, that would have been an error, making any attempt at diplomatic service under section 1608(a)(4) ineffective. *See Azadeh*, 318 F. Supp. 3d at 93 (holding that it is impermissible to effect service under section 1608(a)(4) before attempting service under section 1608(a)(3)). Fortunately, the State Department informed Plaintiffs that its policy requires attempted service under section 1608(a)(3) before attempting service under section 1608(a)(4).

1608(a)(3) when the Clerk of the Court mailed copies of the summons and complaint to the Syrian Foreign Minister).   The Clerk of the Court mailed one copy of the summons and complaint, together with a translation of each, to Syria and SMI, addressed to the head of the Ministry of Foreign Affairs in Syria.  ECF No. 14.  On April 9, 2018, Plaintiffs received a DHL notification stating that the Syrian Foreign Ministry refused delivery of the summons and complaint in Damascus, Syria.  ECF No. 15 at 2.  Nothing more was required for Plaintiffs to satisfy their obligations to attempt service under section 1608(a)(3).  *See Ben-Rafael,* 540 F. Supp. 2d at 52 (holding that service under section 1608(a)(3) was not possible and plaintiff's obligations were satisfied when delivery was attempted and recipient refused delivery).

On April 30, 2018, Plaintiffs requested an attempt of diplomatic service pursuant to section 1608(a)(4).  ECF No. 16; ECF No. 17.  Thereafter, Clerk sent two copies of the summons, complaint, and notice of suit, together with a translation of each, via DHL to the Department of State, Attention of the Overseas Citizens Services, requesting service on the Defendants by diplomatic notes.[9]  ECF No. 18.  Service was executed on Syria and SMI on September 20, 2018 through a diplomatic note delivered by the Foreign Interests section of the Embassy of the Czech Republic.  ECF No. 21.

Accordingly, service was completed under section 1608(a)(4) and the Court should find that it has personal jurisdiction over the Defendants.

---

[9]  Although section 1608(a)(4) requires the package to be sent to the attention of the Director of Special Consular Services, no error was made by the Clerk of the Court here.  Per the Department of State's website, the Office of Legal Affairs, Overseas Citizens Services is currently administering service functions via diplomatic channels. Travel.State.Gov, FSIA Checklist, https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/Service-of-Process/FSIA-Checklist.html (last visited July 22, 2020).

## C.    Liability

After ascertaining that it has jurisdiction, the Court must then determine whether Plaintiffs have established liability under a viable tort cause of action. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 73 (D.D.C. 2010). While section 1605A(c) offers a general private right of action, it "does not itself provide the 'substantive basis' for claims brought under the FSIA." *Force*, __ F. Supp. 3d at __, 2020 WL 2838527, at *24. Rather, FSIA plaintiffs are also required "to prove a [specific] theory of liability." *Valore*, 700 F. Supp. 2d at 73; *see also Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 175-76 (D.D.C. 2010) ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability."). To determine if a plaintiff has properly asserted a substantive basis for liability for their claims, the D.C. Circuit "rel[ies] on well-established principles of law, such as those found in Restatement (Second) of Torts." *See In re Islamic Republic of Iran Terrorism Litig.,* 659 F. Supp. 2d 31, 61 (D.D.C. 2009); *see also Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) (using the Restatement of Torts "as a proxy for state common law" in determining liability under the FSIA). Here, Plaintiffs assert three theories of civil tort liability based on assault, battery and intentional infliction of emotional distress.[10] All three claims of liability are sufficiently pled and established to justify a judgment of default.

### 1.    Assault

Plaintiffs claim that Defendants are liable for John Doe's injuries under an assault theory. ECF No. 30-1 at 18. Liability for assault requires two conditions: "(1) [the defendants] acted

---

[10] In cases dealing with default judgment, courts (1) consider that acts of terrorism are, by their nature, intended to harm and terrify, and (2) accept plaintiffs' uncontroverted assertions of suffering as true. *See Thuneibat*, 167 F. Supp. 3d at 33 ("Uncontroverted factual allegations that are supported by admissible evidence are taken as true."); *Valore*, 700 F. Supp. 2d at 77 ("[A]cts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of such harm.").

'intending to cause a harmful contact with . . ., or an imminent apprehension of such a contact' by, those attacked and (2) those attacked were 'thereby put in such imminent apprehension.'" *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 35 (D.D.C. 2012) (second alteration in original) (quoting *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010)) (citing Restatement (Second) of Torts § 21(1)). Here, Defendants acted with intent to cause harmful contact and put John Doe in imminent apprehension; indeed, such intent and apprehension is the entire purpose of suicide bombings. *See* ECF No. 30-1 at 31–44; *see also Schertzman Cohen v. Islamic Republic of Iran*, No. 17-cv-1214 (JEB), 2019 WL 3037868, at *5 (D.D.C. July 11, 2019) (stating that intending to cause harmful contact and putting those attacked in imminent apprehension of such contact "is the entire purpose of terrorism"). As John Doe was checking in, he first heard a small explosion coming from a failed detonation nearby. ECF No. 30-1 at 32. His apprehension of harmful contact fully manifested itself after the first explosion, which knocked him off his feet; thereafter, the second explosion caused him to lose consciousness. *Id.* at 32–33. Based on these facts, an assault has been sufficiently established as this stage.

      2.     Battery

Plaintiffs claim that Defendants are liable for John Doe's injuries under a battery theory. ECF No. 30-1 at 18. Liability for the tort of battery arises when a defendant acts "[(1)] 'intending to cause a harmful or offensive contact with . . . , or an imminent apprehension of such a contact' by, those attacked and (2) 'a harmful contact with' those attacked 'directly or indirectly result[ed].'" *Wultz*, 864 F. Supp. 2d at 36 (second and third alterations in original) (quoting Restatement (Second) of Torts § 13). Again, "[a]cts of terrorism are, by their very nature, intended to harm." *Id.* As a result of the bombing, John Doe suffered from a wide array of injuries, including ███████████████████████████████████████████████████████████████████████

29

████████████████████████  ECF No. 30-1 at 19–20.  Plaintiffs' allegations

and proffers are sufficient to establish Defendants' liability for battery.

        3.      Intentional Infliction of Emotional Distress

Plaintiffs also claim that Defendants are liable for Jane Doe and their son's injuries under

an intentional infliction of emotional distress ("IIED") theory.  ECF No. 30-1 at 22.  Under general

principles of tort law, "[o]ne who by extreme and outrageous conduct intentionally or recklessly

causes severe emotional distress to another is subject to liability for such emotional distress," both

to the primary victim and "to a member of such person's immediate family who is present at the

time." *Estate of Heiser v. Islamic Republic of Iran (Heiser II)*, 659 F. Supp. 2d 20, 26 (D.D.C.

2009) (quoting Restatement (Second) of Torts § 46).  As the *Heiser II* court reasoned, terrorism is

"unique among the types of tortious activities in both its extreme methods and aims," in that it is

"intended to cause the highest degree of emotional distress, literally, terror." *Id.* at 27 (internal

quotation marks omitted) (quoting *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89

(D.D.C. 2002)); *see also Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)

("Acts of terrorism are by their very definition extreme and outrageous and intended to cause the

highest degree of emotional distress.").  Accordingly, immediate family members of terrorism

victims may state a claim for IIED even if they were not present when the attack occurred.

*Republic of Sudan v. Owens*, 194 A.3d 38, 42 (D.C. 2018).  Jane Doe and their son are experienced

severe emotional distress resulting from the attack as well.  *See* ECF No. 30-1 at 48–70, 172–97.

She suffered the trauma of sitting helplessly in the United States awaiting an update on her

husband's status, believing him dead, cleaning the blood from his body and clothing, and her

resulting ████████████  ECF No. 30-1 at 25, 51, 63, 69, 176.  Their son, as a result of the

physical and resulting emotional injuries of his parents, suffers from ███████████ ██████████████████████████ *Id.* at 26.

In sum, Plaintiffs should be deemed to have sufficiently established all three theories of tort liability at the default stage.

### D.    Compensatory Damages

The FSIA makes foreign states liable to victims of state sponsored terrorism for money damages including "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). "To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain' (*i.e.*, more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages." *Roth*, 78 F. Supp. 3d at 402 (D.D.C. 2015) (some internal quotation marks omitted) (alteration in original) (quoting *Salazar*, 370 F. Supp. 2d at 115–16); *accord Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 289 (D.D.C. 2015). In determining the "reasonable estimate," courts may look to expert testimony and prior awards for comparable injuries. *See Reed*, 845 F. Supp. 2d at 214; *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008). However, in a default case, the Court may not exceed the amount demanded by the plaintiff. *See* Fed. R. Civ. P. 54(c).

While "there is no market where pain and suffering are bought and sold, nor any standard by which compensation for it can be definitely ascertained, or the amount actually endured can be determined," an award amount must be determined and the Court "will not simply award what it abstractly finds to be fair." *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 22–23 (D.D.C. 2002) (internal quotation marks omitted) (quoting *St. Louis S.W.R. Co. v. Kendall*, 114

31

Ark. 224, 169 S.W. 822, 824 (Ark. 1914)). Instead, courts are guided by precedent and awards which have been handed down in previous cases decided under the FSIA, *see Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 134 (D.D.C. 2005) ("Fortunately for this Court, preceden[t] guides its calculations."), and they should "take pains to ensure" that similarly situated plaintiffs receive similar awards, *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007), *abrogated on other grounds as recognized in Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 15 (D.C. Cir. 2015).

Plaintiffs seek three types of damages: pain and suffering damages, solatium damages, and punitive damages.[11] They seek $13,000,000 in compensatory damages and between $13,000,000 and $65,000,000 in punitive damages. ECF No. 30-1 at 20, 23, 27. Specifically, they seek $7.5 million for the injuries and pain and suffering that John Doe experienced as a victim of a terrorist bombing. *Id.* at 20. They also seek $5.5 million total for the emotional distress suffered by Jane Doe and their son. *Id.* at 23. Plaintiffs are seeking punitive damages at a multiplier of between one and five times the total compensatory damages awarded; they defer to the Court to determine the appropriate multiplier. *Id.* at 26–27.

1.   John Doe

John Doe is requesting at least $7.5 million as compensation for his injuries and pain and suffering. ECF No. 30-1 at 20. Assessing appropriate damages for physical and mental injuries in FSIA cases depends upon a variety of factors, including "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain

---

[11] Despite mentioning in passing the potential loss of John Doe's ▆▆▆▆ pension and including a sub-section of their damages motion titled 'Economic Damages,' Plaintiffs do not appear to seek, and have provided no basis for, economic damages. ECF No. 30-1 at 19, 38-39; ECF No. 34-1 at 3. To the extent that Plaintiffs intended to request an award of economic damages, that request should be deemed forfeit. *See, e.g., EEOC v. The George Washington Univ.*, No. 17-cv-1978 (CKK/GMH), 2020 WL 3489478, at *17 (D.D.C. June 26, 2020) ("[P]erfunctory and underdeveloped argument, and arguments that are unsupported by pertinent authority' may be deemed forfeit." (quoting *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013))).

with the victim for the rest of his or her life." *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 59 (D.D.C. 2006). In *Peterson*, this Court adopted a general framework for the calculation of damages that includes a baseline damages award of $5 million in compensatory damages to persons suffering substantial injuries in terrorist attacks. 515 F. Supp. 2d at 54. This Court has explained that it will "depart upward from this baseline to $7.5–$12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead" and will "depart downward to $2–$3 million where victims suffered only minor shrapnel injuries or minor injury from small-arms fire." *Valore*, 700 F. Supp. 2d at 84. With the goal of maintaining consistent awards for like plaintiffs, this framework will be utilized in this case.



   As a result of the airport bombing, John Doe suffered substantial injuries, including: █████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████ ECF
No. 30-1 at 37–38. He has also been required to ███████████████ ending a successful career that he called "one of the highlights of [his] life." ECF No. 34-1 at 3. In considering the award that Plaintiff should receive for these injuries, it is informative to compare prior awards in terrorism cases. This Court granted the plaintiff in *Valore*, a soldier who survived the 1983 Beirut bombing,

an upward departure from the $5 million baseline to $7.5 million; he suffered burns on 90% of his body, shrapnel wounds, and a split leg. *Valore*, 700 F. Supp. 2d at 84. Similarly, the estate of a victim in *Peterson* was awarded $7 million; he suffered a traumatic skull injury requiring surgery, painful burns, and died seven days later. *Peterson*, 515 F. Supp. 2d at 53. This Court awarded the baseline $5 million in *Wamai v. Republic of Sudan* to a bombing victim who was knocked unconscious, suffered shrapnel wounds, burns, emotional trauma, hearing loss and two amputated fingers. 60 F. Supp. 3d 84, 92–93 (D.D.C. 2014). The Court departed downward to a $2.5 million award for another victim of a bombing who suffered minor lacerations and partial vision impairment. *Id.* at 92.

While difficult to compare the injuries, pain, and suffering caused by terrorist attacks, John Doe's injuries are most similar in severity to those of the first bombing victim in *Wamai*. ECF No. 3 at 2; ECF No. 30-1 at 19-21; *Wamai*, 60 F. Supp. 3d at 93. Like her, in the immediate aftermath of the bombing, John Doe was ███████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ECF No. 3 at 2; ECF No. 30-1 at 32–33. Accordingly, the undersigned recommends the same baseline award of $5 million to compensate him for his physical pain and suffering.

    2.    Jane Doe

Plaintiffs are requesting at least $4 million as a solatium award for Jane Doe. ECF No. 30-1 at 21. Solatium awards are designed to compensate victims for the "[m]ental anguish, bereavement, and grief" resulting from a loved one's death or injury. *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356–57 (D.C. Cir. 2018). Common law claims of IIED provide for the same measure of damages as the solatium claims pleaded by the Plaintiffs under section 1605A(c). *Valore*, 700 F. Supp. 2d at 85 ("Under the FSIA, a solatium claim is indistinguishable from an

IIED claim."). Accordingly, a court may consider precedent pertaining to IIED cases when determining solatium awards. *See id.*

This Court developed a framework for calculating FSIA solatium damages in *Estate of Heiser v. Islamic Republic of Iran* (*Heiser I*) wherein spouses of *deceased* victims are awarded approximately $8 million, parents receive $5 million, and siblings receive $2.5 million. 466 F. Supp. 2d at 269; *see also Valore,* 700 F. Supp. 2d at 85 (observing that courts have adopted the *Heiser I* framework as the appropriate measure of damages for family members of terrorism victims). In the context of FSIA cases where loved ones are injured rather than killed, this Court has applied a framework where "awards are 'valued at half of the awards to family members of the deceased'—$4 million, $2.5 million and $1.25 million to spouses, parents, and siblings, respectively." *Oveissi v. Islamic Republic of Iran,* 768 F. Supp. 2d 16, 26 n.10 (D.D.C. 2011); *see also Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 156–58 (D.D.C. 2011).

In this case, as a result of the bombing and the injuries her husband sustained, Jane Doe suffered from ████████████████████████████████████ ECF No. 30-1 at 25, 176. Previous awards from this Court have awarded the baseline amount to spouses who experienced such long-term psychological impacts. *See Schertzman Cohen*, 2019 WL 3037868 at *9 (awarding the baseline award to a spouse that had long-term psychological effects that de-stabilized their life); *Schooley v. Islamic Republic of Iran*, No. 17-cv-1376 (BAH), 2019 WL 2717888, at *77 (D.D.C. June 27, 2019) (spouses experiencing PTSD should receive the baseline award); *Anderson v. Islamic Republic of Iran*, 839 F. Supp. 2d 263, 267 (D.D.C. 2012) (awarding baseline where the family never fully recovered from the trauma of the bombing). Here, the horror of the Brussels bombing and its aftermath have left Jane Doe with diagnosed ███████████
██████████████████████████████████████████████████████████████████

35

██████████████████████████████████████████ ECF No. 30-1 at 51,

177.  Based on her injuries and past awards in similar cases, the undersigned recommends Jane

Doe be awarded the baseline amount of solatium damages—$4 million.

      3.      John and Jane Doe's Son

Plaintiffs are requesting at least $1.5 million as a solatium award for their son.  ECF No.

30-1 at 21.  Previous FSIA cases have awarded the baseline amount of $1.5 million to children of

surviving terrorism victims who experienced lasting emotional distress.  *See Schooley*, 2019 WL

2717888, at *78 (awarding the baseline to children experiencing lasting emotional distress and

disruption to family life in their formative years); *Bland*, 831 F. Supp. 2d at 157 (child impacted

by her father's PTSD received the baseline award).  Here, months after the bombing, John and

Jane Doe took their son to a ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ ECF No. 30-1 at 195.  Despite ████████████

████████████████████████████████████ *Id.* at 196.  Now, he suffers from

████████████████████████████████████████████████████

████████████████████████████ *Id.* at 26, 196.  Although the permanency of his trauma is

unclear, his ████████████████████████████████████████████████

████████ *Id.* at 196.  Accordingly, the undersigned recommends he be awarded $1.5 million in

solatium damages.

    **E.**    **Punitive Damages**

Under the FSIA, a foreign sovereign that is a state sponsor of terrorism may also be held

liable for punitive damages.  28 U.S.C. § 1605A(c); *see e.g.*, *Rimkus*, 750 F. Supp. 2d at 184–85;

*In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 61. Punitive damages are awarded not to compensate the victim, but to punish and deter future outrageous conduct by the foreign state. *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 55 (D.D.C. 2012) (citing *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 61); *Heiser II*, 659 F. Supp. 2d at 29–30. Four factors are considered in determining a punitive damages award, including "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Acosta*, 574 F. Supp. 2d at 30 (internal quotation marks omitted) (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 32 (D.D.C. 1998)). All four factors weigh in favor of awarding punitive damages in this case: the targeted bombing of a crowded airport was unconscionable, the harm it caused was substantial, the need to deter terrorism is high, and Syria is a wealthy sovereign. *See* ECF No. 30-1 (citing the four factors in favor of plaintiffs receiving punitive damages); *see also Colvin*, 363 F. Supp. 3d at 163 (finding that all four factors weighed in favor of awarding punitive damages against Syria, including that it is a sovereign with substantial wealth). As a result, an award of punitive damages is warranted here.

Courts have taken varied approaches when calculating punitive damages in FSIA cases. Some have determined punitive damage awards based on the foreign sovereign's annual expenditure on terrorism multiplied by a factor of between three to five. *Heiser II*, 659 F. Supp. 2d at 30. This expenditure-times-multiplier approach often leads punitive damage awards in excess of $300 million and is considered more appropriate for cases involving "exceptionally deadly attacks." *See Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 87 (D.D.C. 2017) (citing *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011)); *see also Valore*, 700 F. Supp. 2d at 89 (awarding $1 billion in punitive damages for a suicide

bombing attack on U.S. Marine barracks which resulted in 241 deaths); *Acosta*, 574 F. Supp. 2d at 31 (awarding $300 million in punitive damages for assassinations executed by a terrorist group). This approach would also be difficult to apply here, as Plaintiffs presented no evidence of Syria's actual expenditure on terrorism.

A second approach is a lump sum award of $150 million in punitive damages per victim. This approach is typically used in cases where, unlike here, at least one of the plaintiffs dies. *See e.g.*, *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 150 (D.D.C. 2018) (awarding $150 million in punitive damages to family of student killed in terrorist attack); *Baker*, 775 F. Supp. 2d at 86 ($150 million to each of three victims shot during an airplane hijack, one of whom died); *Gates*, 580 F. Supp. 2d at 75 ($150 million each to the estates of two men decapitated on camera).

A third approach is to multiply the total compensatory-damages award by a factor of between one and five. *Fritz v. Islamic Republic of Iran*, 324 F. Supp 3d 54, 65 (D.D.C. 2018); *see also Bluth*, 203 F. Supp. 3d at 26 (awarding punitive damages equal to two times compensatory damages for survivor of terrorist attack); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 105–106 (D.D.C. 2017) (awarding punitive damages equal to three times compensatory damages for plaintiffs injured in a bombing). The multiplier is chosen depending on "various factors, including, among other things, whether the case involved exceptional circumstances, the perceived deterrence effect, the nexus between the defendant and the injurious acts, and the evidence plaintiffs presented regarding the defendant's funding of terrorist activities." *Hamen v. Islamic Republic of Iran*, No. CV 16-cv-1394 (RDM), 2019 WL 4305462, at *10 (D.D.C. Sept. 10, 2019). This approach is most often used in cases where the victims survive a terrorist attack. *See, e.g.*, *Gill*, 249 F. Supp. 3d at 106; *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 167 (D.D.C. 2016); *Harrison*

*v. Republic of Sudan*, 882 F. Supp. 2d 23, 50 (D.D.C. 2012); *but see Fritz*, 324 F. Supp. 3d at 56–66 (awarding punitive damages equal to compensatory damages multiplied by two where four soldiers were abducted and murdered).  Plaintiffs request that the Court use this method in calculating punitive damages here.  ECF No. 30-1 at 27.  Given the nature of the bombing, the Plaintiffs' injuries, and awards given in similar cases, the undersigned recommends using this approach and applying a multiplier of three. *See, e.g., Gill*, 249 F. Supp. 3d at 105-106 (using a three times multiplier for an instance of a terrorist bombing); *Harrison v. Republic of Sudan*, 882 F. Supp. 2d at 50–51 (using a three times multiplier in a terrorist bombing case where no evidence was present that the defendant was particularly amenable to monetary deterrence).  Application of that formula would result in a punitive damages award of $31.5 million.

### F.    Prejudgment Interest

Plaintiffs request prejudgment interest on top of their compensatory-damages award.  The decision to award such interest "is subject to the discretion of the court and equitable considerations." *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997) (internal quotation marks omitted) (quoting *Motion Picture Ass'n of Am. v. Oman*, 969 F.2d 1154, 1157 (D.C. Cir. 1992); *see also Forman v. Korean Air Lines, Co.*, 84 F.3d 446, 450 (D.C. Cir. 1996). "When an award without prejudgment interest fully compensates a plaintiff, an award of prejudgment interest no longer has the intended compensatory purpose and should be denied." *Wyatt*, 908 F. Supp. 2d at 232 (quoting *Price*, 384 F. Supp. 2d at 135).

Courts in this Circuit are split on the award of prejudgment interest in FSIA cases.  Some have made such an award where there was a significant delay between the attack and relief given. *See, e.g., Reed*, 845 F. Supp. 2d at 214 (citing *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 263-65 (D.D.C. 2008)).  Other courts have rejected this justification,

reasoning that the *Heiser I* framework reflects the appropriate level of total, just compensation. *See, e.g., Wyatt*, 908 F. Supp. 2d at 232 ("[P]ain and suffering and solatium damages are both designed to be fully compensatory."). The undersigned calculated the damage award in this case to be fully compensatory. *See, e.g., Wultz*, 864 F. Supp. 2d at 43 (finding the damage award fully compensatory and declining to award prejudgment interest); *Thuneibat*, 167 F. Supp. 3d at 54 (noting solatium damages "do not typically require prejudgment interest because they are 'designed to be fully compensatory'" (quoting *Wyatt*, 908 F. Supp. 2d at 232)). This rationale is particularly salient when, as here, many of the injuries are in the nature of enduring psychological harm and therefore the damage award assumes continued suffering. *See Oveissi*, 768 F. Supp. 2d at 30 n.12 (noting solatium damages are awarded regardless of when attack occurred). Accordingly, it is recommended that prejudgment interest be denied in this case.

## IV.    CONCLUSION

Given Defendants' failure to respond to the Compliant and the adequacy of the Plaintiffs' Motion for Default Judgment, the undersigned **RECOMMENDS** that the Motion (ECF No. 30) be **GRANTED**. For the reasons stated above, the undersigned **RECOMMENDS** that the Plaintiffs be awarded damages in the amounts specified in the table below.

| Summary of Damages | |
|---|---:|
| **Injuries, Pain and Suffering Award to John Doe** | **$5,000,000** |
| | |
| IIED Award to Jane Doe | $4,000,000 |
| IIED Award to Son | $1,500,000 |
| **Total IIED Damages** | **$5,500,000** |
| | |
| **Total Compensatory Damages** | **$10,500,000** |
| | |
| **Punitive Damages** | **$31,500,000** |
| | |
| **Total Damage Award** | **$42,000,000** |

\*       \*       \*       \*       \*

The parties are hereby advised that, under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made and the basis for such objections. The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date: July 27, 2020

_____/s/_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE